**Sharon COURSON, Plaintiff–Appellee,**

v.

**Quinn A. McMILLIAN, individually and as Sheriff of Walton County, a political subdivision of the State of Florida, Defendant,**

**Jim Roy, Defendant–Appellant.**

**No. 90–3400.**

United States Court of Appeals, Eleventh Circuit.

Aug. 30, 1991.

Keith C. Tischler, Powers, Quaschnick & Tischler, Tallahassee, Fla., for defendant-appellant.

Woodburn S. Wesley, Jr., E. Hoyt Walston, Shalimar, Fla., for plaintiff-appellee.

Before COX and BIRCH, Circuit Judges, and GIBSON *, Senior Circuit Judge.

BIRCH, Circuit Judge:

This interlocutory appeal addresses the qualified immunity status of a deputy sheriff relative to a passenger in a vehicle, which was stopped, and the other occupants were arrested. The passenger contends that her constitutional rights were violated during her detention by the officer pursuant to the stop of the vehicle, and as a result of her roadside abandonment. The district court denied the officer's summary judgment motion regarding his claim of qualified immunity, but granted him summary judgment on the state law claim of intentional infliction of emotional distress. Although we affirm summary judgment granted to the officer on the claim of intentional infliction of emotional distress, we reverse and remand the denial of summary judgment on the officer's claim of qualified immunity for proceedings consistent with this opinion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On the night of May 12, 1985, plaintiff-appellee Sharon Courson and two male companions were "four wheeling" in an all-terrain vehicle on a Walton County, Florida beach.[1] When they were ready to leave the beach, Courson, who did not drink any alcoholic beverage, was concerned that her two male companions had consumed a sufficient amount of beer to inhibit their driving ability. Nevertheless, one of the males drove west from the beach on U.S. Highway 98 at approximately 10:00 P.M.; Courson rode as a passenger.

Their vehicle passed defendant-appellant Lieutenant Jim Roy, a deputy sheriff for Walton County, in a no passing area at a speed between 60 and 80 miles per hour in a 45 or 55 miles per hour zone. Roy, who had been conducting surveillance of marijuana fields, had noticed that evening a

---

* Honorable Floyd R. Gibson, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

1. Courson was twenty-three years of age when the incident in question occurred, and her male companions were in their mid to late thirties.

dark, four-wheel drive vehicle, similar to the one that passed him and contained Courson and her companions, in the vicinity of the cultivated marijuana fields. He activated his siren and flashing blue light, and pursued the vehicle. Courson, seated in the front seat between the two males, became aware of Roy's presence as soon as he activated his flashing blue light.

Subsequently, the vehicle stopped on the side of the paved surface of the highway at a condominium construction site, located between two developments. One of the developments was townhouse rental property. The other, which had a guard house at the entrance to the property, was a resort with units available for rent and sale.

Roy stopped his patrol car behind the vehicle and, in a loud voice, requested the occupants to exit. When none of the occupants exited the vehicle, Roy reiterated his instruction. Thereafter, the male driver only left the vehicle. After Roy again repeated his order that all occupants exit, Courson and the other male exited.[2]

Roy observed that each of the three individuals had difficulty getting out of the vehicle. As Courson and her male companions approached, Roy, who was alone, withdrew a shotgun from his patrol car. One of the males became and continued to be verbally abusive and belligerent;[3] he also challenged Roy's authority to conduct the stop and investigation. Roy immediately requested the assistance of backup units. Because he was outnumbered and uncertain whether the three apprehended individuals were involved in criminal activity, Roy instructed them to lie face down on the ground.[4] He continued to hold his shotgun toward the three detainees while he awaited backup assistance.[5]

Subsequently, a Florida highway patrolman arrived. Roy gave his shotgun to the patrolman to guard Courson and her male companions while he searched their vehicle by shining a flashlight into the interior. Thereafter, four Walton County deputy sheriffs arrived at the scene. In addition to Roy's patrol car, Courson's best recollection was that there were two or three patrol cars transporting the backup officers.

Both of the males were arrested, handcuffed, and taken to the Walton County sheriff's department for booking in separate patrol cars. The male driver was charged with driving under the influence of alcohol, speeding, and with fleeing and attempting to elude a law enforcement officer. The other male, who physically resisted arrest and injured one of the officers, was charged with resisting arrest with vio-

2. Courson contends that the vehicle occupants did not hear Roy's instruction to exit the vehicle. Her deposition testimony, however, contradicts the fact that the occupants did not hear Roy's request. R1–19–Deposition of Sharon Courson at 26. Evidenced by his exit, the male driver heard the instruction.

3. The parties dispute whether the abusive language occurred upon the male's exit from the vehicle or after the three were directed to lie on the ground.

4. Courson testified that she was reluctant to obey Roy and questioned him as to whether he meant for her also to lie on the ground. In response, she stated that Roy chambered his shotgun and repeated his instruction that all three individuals lie on the ground, whereupon she complied. R1–19–Deposition of Sharon Courson at 28–29.

5. Roy explained his actions subsequent to the stop of the vehicle and the exit of the occupants:

In light of the circumstances I encountered, I withdrew from my vehicle a shot gun, directed it in the general direction of the occupants of the vehicle and instructed them to stop and lay upon the ground. One of the male occupants of the vehicle who had exited from the passenger side was cussing, yelling and challenging my authority to conduct this stop and investigation. I also immediately requested the assistance of back up units.

While awaiting the arrival of back up units, I remained at the front of my vehicle, continuing to exhibit the shot gun and requiring the occupants of the vehicle to remain prone on the ground. This was done as a result of their initial failure to stop, their initial failure to exit the vehicle as instructed and the belligerent attitude of at least one of the occupants. *Additionally, I was outnumbered and uncertain of whether the individuals apprehended were involved in any other manner of criminal activity, such as the marijuana cultivation I had been investigating earlier in the evening.*

R1–19–Affidavit of Jim Roy at 3–4, paras. 8–9 (emphasis added).

lence, disorderly intoxication, obstruction of justice, assault on law enforcement officers, and battery on a police officer. The lawfulness of these arrests has not been challenged by Courson or her arrested companions.

During the investigation and arrest of male companions, Courson was kept on the ground until both males were taken into custody. Including the wait for backup assistance with her companions, the total time that Courson remained on the ground was approximately thirty minutes; little traffic passed on the highway during that period. She was not directly interrogated, searched, touched, harmed in any way, or charged with any crime.[6]

After Courson's male companions had been taken to the station for booking, Courson was told that she was free to go. Roy put his shotgun away. The officers assisted Courson in searching for her car keys, which she said were left in the vehicle in which the three individuals had been riding. The keys were not found, and the vehicle was towed away. Courson did not ask Roy or another officer to take her anywhere.[7] She walked a short distance to

---

**6.** Roy explained his reasoning in keeping Courson on the ground until her male companions were taken into custody:

> The female passenger in the vehicle was also instructed to lay on the ground. Although she was not uncooperative, the number of individuals involved and the circumstances led me to believe that the most prudent course of action for me was to require all of the individuals to lay upon the ground until I was able to obtain assistance. The female was kept on the ground until both of the other male individuals had been taken into custody. She was then allowed to stand.
>
> The female was not searched, touched, struck or harmed in any way. She was not directly interrogated and did not say much to me or any of the other officers on the scene. She identified herself as Sharon Courson.
>
> . . . .
>
> *Ms. Courson was not arrested or otherwise charged with any criminal offense, nor was she detained beyond the time necessary to determine her involvement in the events that had transpired that evening.*

R1–19–Affidavit of Jim Roy at 5, 6, paras. 12–13, 15 (emphasis added).

Courson testified that she was not harmed physically by Roy or any other officer during her detention:

> Q. You were not I gather physically struck or otherwise harmed on the night in question?
> A. [Courson] No, sir, I was not.
> Q. *What you described does not sound as though Lieutenant Roy or any other law enforcement officer ever made physical contact with you?*
> A. *No, sir.*
> Q. *You were not grabbed, or held, or anything of that nature?*
> A. *No.*

R1–19–Deposition of Sharon Courson at 63 (emphasis added).

**7.** Roy's affidavit states that he asked Courson's two male companions if they would allow her to drive the vehicle home. Upon their refusal, he states that Courson informed him that she would walk to the guard house at the adjoining resort where she would call someone to trans-

port her home. Courson did not request Roy to transport her anywhere.

> I asked both of the male occupants of the vehicle if they would allow Ms. Courson to drive the vehicle home. They refused to agree to allow Ms. Courson to drive the vehicle and therefore it was towed.
>
> After the arrest of the male occupants of the vehicle, Ms. Courson was advised that she was free to go. She did not request that I transport her home, or to any other location and, to the best of my recollection, stated that she could contact someone who would transport her home. She indicated that she would walk to a phone, which she apparently did, by walking to the guard shack at the Sea Scape. I presumed she made a telephone call and arranged for transportation on her own.

R1–19–Affidavit of Jim Roy at 5–6, paras. 14–15.

Courson testified that one of the other officers asked Roy if she could take the vehicle home, and Roy refused because the vehicle did not belong to her. According to Courson, Roy showed no interest in her transportation home, but she concedes that she did not ask him or any other officer to transport her anywhere.

> Q. Okay, so after Roy says you can't take the truck, what happens then?
> A. [Courson] That officer that asked him [Roy] that turned around and he didn't say another word. Uh, I said to Lieutenant Roy, "Well how am I going to get home[?]" And as I said "home" he just dropped the pad down and he said, he said, "I hope that you can find a way home." And I just stood there and he turned around, walked and got in his car and drove away. And the other officer was gone also.
> Q. *Did you ask him [Roy] to take you anywhere?*
> A. *No, sir.*
> Q. Did he offer to take you anywhere?
> A. No, sir.
> Q. *How about the other deputy, did you ask him to take you anywhere?*
> A. *No, sir.*
> Q. Did he offer to take you anywhere?
> A. No, sir.

the guard house at the adjacent resort and called a friend, who came to take her home, at which she arrived at approximately midnight.[8]

Courson lost no time from work as a result of this incident.[9] She testified that she was not physically injured during her detention by Roy, that she suffered no physical consequences, and that she had no medical treatment and received no medication for any condition resulting from this incident.[10] Courson's only residual effect from the experience is her claimed mistrust of police officers.[11]

Courson initiated this action in the Walton County, Florida circuit court. Her four-count complaint alleged violation of her Fourth, Fifth and Fourteenth Amendment rights resulting from her detention, including excessive force, and abandonment as well as related state tort claims. Quinn A. McMillian, Sheriff of Walton County, originally was a defendant for allegedly allowing a policy of conduct by his officers permitting Roy's actions, and the sheriff's failure to supervise his deputies.

Defendants McMillian and Roy removed the case to federal district court for the Northern District of Florida. Pursuant to defendants' motion to dismiss, the district court dismissed the complaint as to Sheriff McMillian in his individual and official capacities.

The remaining claims against Roy in his individual capacity were: a 42 U.S.C. § 1983 claim for unlawful arrest and detention and for the use of unreasonable force in violation of the Fourth, Fifth and Fourteenth Amendments; a Fourteenth Amendment claim for recklessly placing Courson in danger when Roy abandoned her at the scene; and Florida claims for false arrest and imprisonment,[12] assault, and intentional infliction of emotional distress. Roy moved for summary judgment on the merits and on the basis of his entitlement to qualified immunity. Concluding that Roy's conduct was not outrageous as defined by the Florida Supreme Court, the district court granted Roy summary judgment on Courson's claim for intentional infliction of emotional distress.[13] Without analyzing

R1–19–Deposition of Sharon Courson at 53 (emphasis added).

**8.** Courson testified that her walk from the scene of her detention to the guard house, where she called her friend to transport her, was "[a]bout a mile," but also admitted that the length of a football field was a suitable frame of reference. R1–19–Deposition of Sharon Courson at 56, 57. The photographs, attached to Roy's affidavit, show the scene of Courson's detention by the condominium construction site and the adjoining resort and guard house. The pictures evidence that the distance of Courson's walk was consistent with her football field analogy.

**9.** Although Courson subsequently did leave the employer for whom she was working at the time of the incident in question, she testified that her work, and not this experience, was the reason for her departure. R1–19–Deposition of Sharon Courson at 72–73.

**10.** R1–19–Deposition of Sharon Courson at 63, 67.

**11.** Courson described her residual, nonphysical effects of the incident:

Q. Describe for me if you will how you were, or have been injured as a result of this incident?
A. [Courson] There's, uh, I feel like there's a permanent and definite mistrust and fear of

police officers. I'm afraid to be stopped by a police officer.

. . . .

Q. You alleged in your complaint that you have and will suffer mental and physical pain. Can you tell me a little bit about the mental aspects, fear, nervousness, and so forth? Is there any physical pain or physical consequences that you can identify or describe for me that has [sic] resulted from this incident?
A. Nothing other than the stress, and, uh, the headaches from the stress that have happened. But nothing physical or anything. You know I told you that I was not harmed that night as far as a physically hurt or anything like that.
R1–19–Deposition of Sharon Courson at 63, 72. Although Courson does not appear to consider her headaches a physical ailment, we note that our review of the record indicates that the headache condition apparently occurred as a direct result of her detention and is not alleged to be a persisting or permanent condition resulting from this incident.

**12.** Under Florida law, false arrest is distinguishable from false imprisonment in terminology only. *See Johnson v. Weiner,* 155 Fla. 169, 171, 19 So.2d 699, 700 (1944).

**13.** The district court recited the standard used by the Florida Supreme Court to find intentional infliction of emotional distress:

the governing law specifically regarding seizure, unreasonable force and abandonment in May, 1985, the district court denied Roy summary judgment on the basis of qualified immunity and on all other claims. Roy appeals the district court's denying him qualified immunity.

## II. DISCUSSION

### A. *Jurisdiction*

"[A] district court's denial of qualified immunity is immediately appealable." *Hudgins v. City of Ashburn,* 890 F.2d 396, 402 (11th Cir.1989). The purpose for this exception to 28 U.S.C. § 1291, whereby we review final decisions of district courts, is to protect public officials entitled to qualified immunity from suit. *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985); *Hutton v. Strickland,* 919 F.2d 1531, 1536 (11th Cir.1990). This entitlement to qualified immunity obviously would be lost if the case proceeded to trial erroneously. *Mitchell,* 472 U.S. at 526, 105 S.Ct. at 2815; *Hutton,* 919 F.2d at 1536.

Qualified immunity shields government officials executing discretionary responsibilities from civil damages "insofar as their conduct does not violate *clearly established statutory or constitutional rights* of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) (emphasis added). Therefore, qualified immunity "turns on an issue of law," and our review is *de novo. Mitchell,* 472 U.S. at 530, 105 S.Ct. at 2817; *Hutton,* 919 F.2d at 1536; *Hudgins,* 890 F.2d at 403. Procedurally, qualified immunity must be pled by the defendant official as an affirmative defense. *Harlow,* 457 U.S. at 815, 102 S.Ct. at 2736; *Hutton,* 919 F.2d at 1536.

In this case, Roy pled qualified immunity as an affirmative defense. The legal issue for our determination is whether in May, 1985, it was unconstitutional for a law enforcement officer to detain a passenger of a vehicle, stopped for exceeding the lawful speed limit; to require that individual to lie on the ground with the other occupants of the vehicle while the officer held a shotgun on them during the time that he awaited assistance and conducted an investigation; and to leave the unarrested passenger alone without transportation home. Jurisdiction is appropriate in this case.

### B. *Summary Judgment Review*

The Supreme Court has explained the scope of our review of a district court's denial of a summary judgment motion based on qualified immunity:

An appellate court reviewing the denial of the defendant's claim of immunity need not consider the correctness of the plaintiff's version of the facts, nor even determine whether the plaintiff's allegations actually state a claim. All it need determine is a question of law: whether the legal norms allegedly violated by the defendant were clearly established at the time of the challenged actions or, in cases where the district court has denied summary judgment for the defendant on the ground that even under the defendant's version of the facts the defendant's conduct violated clearly established law, whether the law clearly proscribed the actions the defendant claims he took.

*Mitchell,* 472 U.S. at 528, 105 S.Ct. at 2816 (footnote omitted). Following this Supreme Court guidance, our court requires a defendant to establish his entitlement to qualified immunity as a matter of law by showing that no genuine issues of material fact relating to the implicated legal questions exist. *Hutton,* 919 F.2d at 1536; *see*

"Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would

arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!' " R2–34–16 (quoting *Metropolitan Life Ins. Co. v. McCarson,* 467 So.2d 277, 278–79 (Fla.1985)). The district court concluded that "[e]ven under plaintiff's version of the facts, I find Roy's conduct does not meet this standard of outrageousness." R2–34–16.

Fed.R.Civ.P. 56(c). Whether a claimed right "is clearly established is a question of law for the court to decide." *Andreu v. Sapp,* 919 F.2d 637, 641 (11th Cir.1990). If genuine issues concerning material facts regarding the implicated legal issues are present, then the district court properly denied summary judgment and the case must be tried for resolution of those factual questions. *Hutton,* 919 F.2d at 1536; *Hudgins,* 890 F.2d at 403.

■ To avoid summary judgment, an opposing plaintiff must show that the defendant is not entitled to qualified immunity legally or that there is a genuine issue of material fact regarding the defendant's conduct as being violative of the clearly established law governing the case. *See Hutton,* 919 F.2d at 1536. The Court has explained the meaning of a genuine factual dispute under Rule 56(c) of the Federal Rules of Civil Procedure: "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (emphasis in original). Following discovery, the plaintiff opposing summary judgment may not rely on facts in the complaint, but must raise genuine issues of material fact to counter facts supporting the defendant's claim of qualified immunity. *Hutton,* 919 F.2d at 1537; Fed.R.Civ.P. 56(e); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)).

## C. Qualified Immunity Analysis

■ The Supreme Court has developed an objective-reasonableness test for evaluating actions of a government official claiming qualified immunity: the official's action must be evaluated against "clearly established law," consisting of statutory or constitutional rights that a reasonable person should have known. *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738; *Rich v. Dollar,* 841 F.2d 1558, 1563 (11th Cir.1988). The

use of this test precludes the determination by district courts of subjective good faith in government officials' conduct in section 1983 actions. *Hutton,* 919 F.2d at 1537; *see Harlow,* 457 U.S. at 815–19, 102 S.Ct. at 2736–39. This objective-reasonableness test provides qualified immunity protection to "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986); *Hutton,* 919 F.2d at 1537.

■ In *Rich,* this circuit derived a two-part analysis for applying the objective-reasonableness test to a qualified immunity defense:

1. The defendant public official must first prove that "he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred."

2. Once the defendant public official satisfies his burden of moving forward with the evidence, the burden shifts to the plaintiff to show lack of good faith on the defendant's part. This burden is met by proof demonstrating that the defendant public official's actions "violated clearly established constitutional law."

*Rich,* 841 F.2d at 1563–64 (quoting *Zeigler v. Jackson,* 716 F.2d 847, 849 (11th Cir. 1983) (per curiam)); *Hutton,* 919 F.2d at 1537. Under the *Zeigler/Rich* formulation of the objective-reasonableness test, a government official proves that he acted within his discretionary authority by showing " 'objective circumstances which would compel the conclusion that his actions were undertaken pursuant to the performance of his duties and within the scope of his authority.' " *Rich,* 841 F.2d at 1564 (quoting *Barker v. Norman,* 651 F.2d 1107, 1121 (5th Cir. Unit A July 1981)); *Hutton,* 919 F.2d at 1537.

■ The second component of the *Zeigler/Rich* objective-reasonableness test is divided into two analytical subparts. *Rich,* 841 F.2d at 1563–64 (citing *Mitchell,* 472 U.S. at 528, 105 S.Ct. at 2816); *Hutton,* 919 F.2d at 1538. First, the reviewing court must decide whether the applicable law

was clearly established when the governmental action in question occurred. *Rich,* 841 F.2d at 1563–64 (citing *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738); *Hutton,* 919 F.2d at 1538; *see Barts v. Joyner,* 865 F.2d 1187, 1190 (11th Cir.) ("To defeat a qualified immunity defense, plaintiff bears the burden of showing that 'the legal norms allegedly violated by the defendant were clearly established at the time of the challenged actions or, ... the law clearly proscribed the actions the defendant ... took.'" (quoting *Mitchell,* 472 U.S. at 528, 105 S.Ct. at 2816)) *cert. denied,* —— U.S. ——, 110 S.Ct. 101, 107 L.Ed.2d 65 (1989). "Clearly established," is defined, with reference to the right that the official is alleged to have violated, as meaning that "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." [14] *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). Second, the court must determine whether there is a genuine issue of fact concerning the government official's conduct being in violation of clearly established law. *Rich,* 841 F.2d at 1563–65 (citing *Mitchell,* 472 U.S. at 528, 105 S.Ct. at 2816); *Hutton,* 919 F.2d at 1538; *see, e.g., Herren v. Bowyer,* 850 F.2d 1543, 1546–47 (11th Cir.1988); *Webb v. Ethridge,* 849 F.2d 546, 550 (11th Cir.1988) (Genuine issues of material fact precluded summary judgment based on qualified immunity.). Accordingly, we shall assess Courson's claims against Roy with respect to seizure, unreasonable force and abandonment under the *Zeigler/Rich* analysis.

### 1. *Seizure*

■■■ Courson has alleged that Roy violated her Fourth and Fourteenth Amendment protections against detention without probable cause. Personal encounters between law enforcement officers and citizens are "seizures" on occasions "when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." [15] *Terry v. Ohio,* 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968). Roy seized Courson along with her companions because she was not free to go until Roy so informed her after the investigation and arrest of her male companions. Therefore, we must evaluate Roy's actions with respect to Courson under the *Zeigler/Rich* test to determine whether he is entitled to qualified immunity for his conduct in May, 1985.

■■■ Our initial determination is whether Roy was acting within the scope of his discretionary authority when he stopped and detained Courson and her companions. It is undisputed that Roy was on duty when he stopped the vehicle. Courson has neither challenged Roy's probable cause in making the stop, because she acknowledges that their vehicle was exceeding the lawful speed limit, nor questioned the arrests of her companions.[16] We conclude that these objective circumstances

---

**14.** *Rich* recognizes two situations where qualified immunity is accorded to government officials: 1) when the law that they allegedly violated *is not clearly established, see, e.g., Clark v. Evans,* 840 F.2d 876, 882–84 (11th Cir.1988); *Muhammad v. Wainwright,* 839 F.2d 1422, 1424–25 (11th Cir.1987), and 2) when the law *is clearly established* and the court decides that the defendant's conduct did not violate any right accorded to the plaintiff under clearly established law. *See Rich,* 841 F.2d at 1564–65. In this case, we have determined that the abandonment issue is included in the first category, and that the seizure and unreasonable force issues are encompassed by the second category, as we discuss hereinafter.

**15.** The Supreme Court has instructed that, without physical contact, the show of authority to effect a seizure must cause the individual to submit to the asserted authority. *California v. Hodari,* —— U.S. ——, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991).

**16.** "Probable cause exists where 'the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." *Brinegar v. United States,* 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1310–11, 93 L.Ed. 1879 (1949) (quoting *Carroll v. United States,* 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925)). Furthermore, a Florida law enforcement officer may make a warrantless arrest in the following situations:

**When arrest by officer without warrant is lawful.**—A law enforcement officer may arrest a person without a warrant when:

demonstrate that Roy was acting within the purview of his discretionary authority when he stopped the vehicle in which Courson and her companions were riding and detained them. *See Hutton,* 919 F.2d at 1537; *Rich,* 841 F.2d at 1564.

The burden thereafter shifts to Courson to show that Roy's conduct violated clearly established constitutional law. As opposed to the initial stop of the vehicle, Courson apparently objects to her requested exit from the vehicle and subsequent detention. We will limit our analysis of Courson's seizure to these issues. Under this aspect of the *Zeigler/Rich* analysis, we must determine whether the applicable law was clearly established when Roy detained Courson with her companions in May, 1985. *Rich,* 841 F.2d at 1563–64. Because proba-

ble cause for the stop existed for the male driver only, we find that our analysis regarding the law applicable to Courson is analogous to a warrantless investigatory stop under *Terry* rather than a custodial arrest.[17] *See United States v. Neu,* 879 F.2d 805, 808 (10th Cir.1989) ("A traffic stop ... is ordinarily a limited seizure within the meaning of the Fourth Amendment" and "is subject to the less rigorous requirements of *Terry* ... rather than the more stringent constitutional strictures of a custodial arrest."); *see also United States v. Roper,* 702 F.2d 984, 985 (11th Cir.1983) ("If there was merely an investigatory stop, ... only reasonable suspicion is required to pass constitutional muster.").

"The Fourth and Fourteenth Amendments are implicated in this case because

---

(1) The person has committed a felony or misdemeanor or violated a municipal or county ordinance in the presence of the officer. An arrest for the commission of a misdemeanor or the violation of a municipal or county ordinance shall be made immediately or in fresh pursuit.

Fla.Stat., § 901.15(1) (1985). Because Courson and her companions passed Roy at an excessive rate of speed, the speeding violation occurred in his presence. Traffic violations may constitute probable cause for arrest. *See Lenard v. Argento,* 699 F.2d 874, 885 (7th Cir.), *cert. denied,* 464 U.S. 815, 104 S.Ct. 69, 78 L.Ed.2d 84 (1983). The Florida Supreme Court has held that "[t]he facts constituting probable cause need not meet the standard of conclusiveness and probability required of the circumstantial facts upon which a conviction must be based." *Shriner v. State,* 386 So.2d 525, 528 (Fla.1980) (per curiam), *cert. denied,* 449 U.S. 1103, 101 S.Ct. 899, 66 L.Ed.2d 829 (1981). "The existence of probable cause ... is an absolute bar to a section 1983 action for false arrest." *Marx v. Gumbinner,* 905 F.2d 1503, 1505–06 (11th Cir.1990).

17. We observe that Roy may have had reasonable suspicion under *Terry* to investigate the vehicle and its occupants because he thought that the vehicle resembled one that he had seen earlier that evening in the vicinity of cultivated marijuana fields that he was watching. In addition to his probable cause for stopping the vehicle for speeding, Roy noticed that the vehicle did not pull over to the roadside when he activated his siren and flashing blue light. The latter fact could have caused Roy to believe that the vehicle that he was following was fleeing. *See United States v. Hosch,* 577 F.2d 963, 965 (5th Cir.1978) ("While it may be commonplace for vehicles to drive in excess of normal speed limits in sparsely populated areas, we think that the officers were entitled to draw the rational

inference of flight from the actions of appellant's vehicle in this case.").

The possibility of flight, in addition to Roy's reasonable suspicion that the vehicle and its occupants might be related to the marijuana field and, thus, implicated in a drug offense, may have increased Roy's reasonable suspicion and incentive to ascertain whether the occupants were involved in marijuana cultivation. This suspicion was consistent with his flashlight search of the vehicle while the highway patrolman guarded Courson and her companions. The Supreme Court has held that an officer violates no Fourth Amendment right by shining a flashlight into a car because no legitimate expectation of privacy exists in a vehicle interior, which may be viewed by passersby or police officers. *Texas v. Brown,* 460 U.S. 730, 740–41, 103 S.Ct. 1535, 1542–43, 75 L.Ed.2d 502 (1983) (plurality opinion). We also note that even a search of the vehicle would have been valid because the Supreme Court has held that an investigative *Terry* stop can extend to the passenger compartment of an automobile in the absence of probable cause to arrest. *Michigan v. Long,* 463 U.S. 1032, 1049, 103 S.Ct. 3469, 3481, 77 L.Ed.2d 1201 (1983); *United States v. Aldridge,* 719 F.2d 368, 372 (11th Cir.1983); *see United States v. Sokolow,* 490 U.S. 1, 10, 109 S.Ct. 1581, 1587, 104 L.Ed.2d 1 (1989) (The Supreme Court has found that " 'innocent behavior will frequently provide the basis for a showing of probable cause,' and that '[i]n making a determination of probable cause the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts.' That principle applies equally well to the reasonable suspicion inquiry." (quoting *Illinois v. Gates,* 462 U.S. 213, 243–44 n. 13, 103 S.Ct. 2317, 2335 n. 13, 76 L.Ed.2d 527 (1983)).

stopping an automobile and detaining its occupants constitute a 'seizure' within the meaning of those Amendments, even though the purpose of the stop is limited and the resulting detention quite brief." *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979). The Court has recognized the constitutionality of stops of automobiles and the detention of the occupants for questioning to determine if illegal aliens are present, when officers have a reasonable suspicion. *See, e.g., United States v. Cortez*, 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981); *United States v. Brignoni–Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). Explaining the necessity of investigatory detentions generally, the Court stated:

> The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response. A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time.

*Adams v. Williams*, 407 U.S. 143, 145–46, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972) (citations omitted); *see INS v. Delgado*, 466 U.S. 210, 216, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984) ("[P]olice questioning, by itself, is unlikely to result in a Fourth Amendment violation.").

The Supreme Court has directed a balancing of competing interests in determining the unreasonableness of a seizure within the meaning of the Fourth Amendment:

> We must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion. When the nature and extent of the detention are minimally intrusive of the individual's Fourth Amendment interests, the opposing law enforcement interests can

support a seizure based on less than probable cause.

*United States v. Place*, 462 U.S. 696, 703, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983); *see Prouse*, 440 U.S. at 654, 99 S.Ct. at 1396 ("[T]he permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." (footnote omitted)). This court has determined that "[t]he distinction between an arrest and an investigatory stop depends upon the nature and degree of the intrusion *under all the facts of the particular encounter*," and has emphasized that "[t]he facts are important." *Roper*, 702 F.2d at 985 (emphasis added).

In *Roper*, an Atlanta police officer observed at approximately 7:00 P.M., a vehicle fitting the description of an automobile belonging to an individual wanted for prosecution for federal bail jumping. He recognized the vehicle from a bail bond company flyer. After confirming the license plate and requesting assistance, the officer stopped the vehicle in a restaurant parking lot, approached the driver with his pistol drawn and told the two occupants to place their hands on the dashboard. When another police officer arrived, the two occupants were told to exit the vehicle. After determining through radio communication that there was a probation violation warrant for Roper's arrest, the officer arrested him. The other occupant of the vehicle was detained until the officers determined that there were no charges pending against him.

This court determined that neither the officers' directing the two occupants to exit the vehicle, nor the fact that an officer's weapon was drawn during the encounter, converted the investigative stop into an arrest. *Id.* at 987. The court concluded that "it is clear that an investigative stop does not become an arrest merely because an officer directs the subject of an investigation out of a vehicle." *Id.; see Pennsylvania v. Mimms*, 434 U.S. 106, 110–11, 98 S.Ct. 330, 333, 54 L.Ed.2d 331 (1977)

(When an officer, with no reason to believe that a motorist was armed or dangerous, directed a motorist stopped for a minor traffic violation out of his car, the Supreme Court held that concern for the officer's safety outweighed the slight intrusion on the motorist's liberty.); *United States v. White*, 648 F.2d 29, 36–40 (D.C.Cir.) (An officer's ordering a motorist to leave a vehicle does not transform an investigative stop into an arrest.), *cert. denied*, 454 U.S. 924, 102 S.Ct. 424, 70 L.Ed.2d 233 (1981). Roy did not violate clearly established Supreme Court and Eleventh Circuit law in requesting Courson to exit the vehicle, particularly when she did not comply until his third order.[18]

The Supreme Court has instructed that the reasonableness of the duration of an investigative stop cannot be delineated exactly; although "a 'bright line' rule would be desirable" guidance, "common sense and ordinary human experience must govern over rigid criteria." [19] *United States v. Sharpe*, 470 U.S. 675, 685, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985). In *Sharpe*, the Court found that a twenty-minute investigatory stop prior to the defendant's arrest was not unreasonable when most of the detention time was spent contacting and awaiting assistance from local police and the remainder was spent questioning the driver and examining the contents of his truck. 470 U.S. at 687, 105 S.Ct. at 1576. The Court explained the analysis for the reasonableness of the duration of an investigatory stop:

> In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant. A court making this assessment should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing. A creative judge engaged in *post hoc* evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished. But *"[t]he fact that the protection of the public might, in the abstract, have been accomplished by 'less intrusive' means does not, itself, render the search unreasonable." The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it.*

470 U.S. at 686–87, 105 S.Ct. at 1575–76 (citations omitted) (emphasis added).

■ Finding a twenty-five minute investigatory detention to be reasonable under the circumstances and not an arrest, this court determined that "[a]lthough police delayed [the defendant's] return to his motel by twenty-five minutes, we cannot regard their asking him to remain at the point where he was stopped an arrest." [20] *United States v. Willis*, 759 F.2d 1486, 1497 (11th Cir.), *cert. denied*, 474 U.S. 849, 106 S.Ct. 144, 88 L.Ed.2d 119 (1985). Con-

---

**18.** Even if the occupants did not hear Roy's instruction to exit the vehicle, we note that their failure to exit as instructed was reasonable cause for some concern regarding their cooperation and, thus, influenced his subsequent actions.

**19.** The Court previously had rejected a permissible time limitation for a *Terry* stop:

> We understand the desirability of providing law enforcement authorities with a clear rule to guide their conduct. Nevertheless, we question the wisdom of a rigid time limitation. Such a limit would undermine the equally important need to allow authorities to graduate their responses to the demands of any particular situation.

*Place*, 462 U.S. at 709 n. 10, 103 S.Ct. at 2646 n. 10.

**20.** Although decided subsequent to May, 1985, this circuit has found that an investigative stop that lasted approximately fifty minutes to be reasonable for a *Terry* investigative detention. *United States v. Hardy*, 855 F.2d 753, 761 (11th Cir.1988), *cert. denied*, 489 U.S. 1019, 109 S.Ct. 1137, 103 L.Ed.2d 198 (1989). Most of this time was spent awaiting assistance and not questioning the two defendants, initially stopped for speeding. This court concluded that "the doubts raised by the length of the detention are not sufficient for us to find that the stop violated the fourth amendment." *Id.*

siderably longer periods for investigatory detentions have been found to be unreasonable. *See Place*, 462 U.S. 696, 103 S.Ct. 2637 (ninety minutes); *United States v. Puglisi*, 723 F.2d 779 (11th Cir.1984) (140 minutes). We conclude that Roy's detention of Courson for approximately thirty minutes, the majority of the time having been spent awaiting assistance, was not unreasonable for an investigatory stop.

Moreover, the totality of circumstances determines when an encounter has become too intrusive to be classified as a seizure and has become an arrest, requiring probable cause.[21] *Florida v. Royer*, 460 U.S. 491, 499–500, 103 S.Ct. 1319, 1325–26, 75 L.Ed.2d 229 (1983) (plurality opinion). "The reasonableness of a stop turns on the facts and circumstances of each case. In particular, the Court has emphasized (i) the public interest served by the seizure, (ii) the nature and scope of the intrusion, and (iii) the objective facts upon which the law enforcement officer relied in light of his knowledge and expertise." *United States v. Mendenhall*, 446 U.S. 544, 561, 100 S.Ct. 1870, 1881, 64 L.Ed.2d 497 (1980). This court has determined that "the use of a particular method to restrain a person's freedom of movement does not necessarily make police action tantamount to an arrest," and that "[p]olice may take reason-

able action, based upon the circumstances, to protect themselves ... or to maintain the status quo." *United States v. Kapperman*, 764 F.2d 786, 790 n. 4 (11th Cir.1985). Furthermore, this circuit has recognized that an officer's not taking the detained individual to a station or office,[22] not conducting a full search of the person,[23] or not touching the individual [24] indicate an investigatory stop rather than an arrest.

The particular facts of this case are significant. Courson and her male companions, traveling at excessive speed in a no passing zone late at night, passed Roy in a vehicle that was similar to one that he had noticed earlier in the evening in the vicinity of cultivated marijuana fields that he was watching. The vehicle did not respond initially to his siren and flashing blue light. After stopping at the side of the highway, Courson and her companions did not respond to Roy's loud instruction to exit the vehicle. The vehicle occupants appeared to have difficulty exiting, possibly indicating intoxication or drug use. All three walked toward Roy, who was alone. Roy called for assistance, withdrew his shotgun and approached the three individuals, one of whom became verbally abusive. Roy commanded them to lie on the ground while he trained his gun toward them awaiting assistance. Following the arrival of assistance, the two males were arrested, and

**21.** An investigatory stop requires "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21, 88 S.Ct. at 1879. In contrast, probable cause to arrest exists "where the facts and circumstances within the collective knowledge of the law enforcement officials, of which they had reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe that an offense has been or is being committed." *United States v. Blasco*, 702 F.2d 1315, 1324 (11th Cir.), *cert. denied*, 464 U.S. 914, 104 S.Ct. 275, 78 L.Ed.2d 256 (1983).

**22.** Requiring an individual to accompany police to an office indicates a detention for a time period longer than that permitted in a seizure; cuts the individual off from the outside world, without indication of when he might be allowed to leave; places him in unfamiliar surroundings; may subject him to increased implicit police pressure; and leaves him without third parties to confirm his story of events

that may have occurred, should his story differ from that of the police. Such a detention, if not by consent—and, as we noted earlier, courts should scrutinize exceptionally closely whether consent in fact was voluntary in such situations—we believe is only constitutional if accompanied by probable cause. *United States v. Berry*, 670 F.2d 583, 602 (5th Cir. Unit B 1982) (en banc).

**23.** "A *Terry* stop cannot be used as the basis of a 'full search' that would normally be warranted only by the existence of probable cause, consent, or a valid arrest." *Hardy*, 855 F.2d at 759 (citing *Place*, 462 U.S. at 706, 103 S.Ct. at 2644; *Royer*, 460 U.S. at 499, 103 S.Ct. at 1325).

**24.** One of the factors that was instrumental in this court's determination that a seizure and not an arrest occurred was the fact that the law enforcement officer "did not at any point physically touch appellee." *United States v. Espinosa–Guerra*, 805 F.2d 1502, 1510 n. 26 (11th Cir. 1986).

Courson subsequently was informed that she was free to go. Other than essentially asking her identity, Courson was not interrogated. Given the circumstances of the stop, she was not detained longer than necessary to conduct this basic inquiry and to determine her involvement in the events of the evening. She was not touched physically, and she was not taken from the scene of the stop.

"[T]he facts [must] be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *Terry*, 392 U.S. at 21–22, 88 S.Ct. at 1880. Given the late hour, the fact that he was alone and walking toward three people whom he had stopped, and the unruliness of one of these individuals, we conclude that Roy's method of subduing and securing these people until assistance arrived was reasonable. He not only had to maintain order until help arrived, but also he had to protect himself. As a practical matter, he could not have interrogated them alone. Given the fact that he had to await assistance, and then interrogate the individuals, determining that the two males should be arrested, we find that Courson's detention was not unreasonable. *See Gasner v. City of Garland*, 864 F.2d 394, 400 (5th Cir.1989) ("A person who has been pulled over for committing a traffic violation, regardless of the circumstances surrounding the violation, simply does not have the right to leave the scene until the officer has completed an investigation that is reasonable under the circumstances." (footnote omitted)).

Even without probable cause to arrest Courson, Roy had sufficient reasonable suspicion to conduct an investigatory stop with respect to her. *See Brower v. County of Inyo*, 489 U.S. 593, 599, 109 S.Ct. 1378, 1382, 103 L.Ed.2d 628 (1989) (" 'Seizure' alone is not enough for § 1983 liability; the seizure must be 'unreasonable.' "). As discussed herein, we have determined that Supreme Court and Eleventh Circuit law was clearly established in May, 1985, to embrace Roy's actions concerning Courson as an investigatory stop. We further find that there is no genuine issue of material fact regarding Roy's conduct. Courson has failed to carry her burden of showing that Roy's conduct violated clearly established law. We, therefore, conclude that Roy's seizure of Courson did not abridge her Fourth and Fourteenth Amendment rights.

## 2. *Unreasonable Force*

 Courson complains that Roy's requiring her to lie on the ground while he directed a shotgun toward her constituted excessive force, violating her Fourth, Fifth and Fourteenth Amendment rights. We essentially have addressed this claim in the context of our seizure analysis. The reasonableness of Roy's particular methods of executing this seizure, which included Courson, are governed by the conditions under which the seizure occurred, as we have discussed.

We have established that Roy was acting within the scope of his discretionary authority in seizing Courson with her male companions and that investigatory stop analysis is appropriate for Courson's claims. We additionally note that law enforcement officers on duty generally are armed. Roy, therefore, has met the first part of the *Zeigler/Rich* analysis. The burden shifts to Courson to show that Roy violated clearly established constitutional law in May, 1985, by requiring her to lie on the ground while directing his shotgun toward Courson and her companions.

"Regarding the drawn gun, this Court has indicated that an officer's display of weapons does not necessarily convert an investigatory stop into an arrest." *United States v. Roper*, 702 F.2d 984, 987 (11th Cir.1983); *accord United States v. Pantoja–Soto*, 768 F.2d 1235, 1236 (11th Cir.1985) (per curiam). This court also cited other circuit courts, which, prior to 1983, had "held that the use of a gun does not *automatically* convert an investigatory stop into an arrest." *Roper*, 702 F.2d at 987 (citations omitted) (emphasis in original). The lone police officer in *Roper* approached a vehicle, containing the defendant who subsequently was arrested and his son who

was not, with a drawn pistol that he held on the vehicle occupants, while requiring them to hold their hands on the dashboard until assistance arrived.

This court found guidance in a former Fifth Circuit case where the court approved following a high speed pursuit the approach of an agent with a gun pointed at a car containing three young males:

"By drawing his revolver as he approached the Cadillac it may reasonably be contended he was exhibiting proper caution under the circumstances. It does not seem to us that, without regard to motive, solely because an officer draws his weapon, an investigatory stop is turned into an arrest. To require an officer to risk his life in order to make an investigatory stop would run contrary to the intent of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)."

*Id.* (quoting *United States v. Maslanka*, 501 F.2d 208, 213 n. 10 (5th Cir.1974), *cert. denied*, 421 U.S. 912, 95 S.Ct. 1567, 43 L.Ed.2d 777 (1975)) (citing *United States v. Worthington*, 544 F.2d 1275 (5th Cir.1977) (holding that an investigatory stop is not an arrest because an officer draws a gun)). The *Roper* court also dispelled any contention that officers' drawing guns on stopped vehicle occupants is limited to situations when suspects reportedly are armed or seek to evade detention. That court found a District of Columbia Circuit case instructive. *Roper*, 702 F.2d at 988 (citing *United States v. White*, 648 F.2d 29 (D.C.Cir. 1981)). Although the vehicle occupants in *White* were unarmed, two officers following an anonymous tip approached the vehicle with drawn guns. When the defendant did not comply with an order to exit the car, one of the officers repeated the order, told the defendant to place his hands

on the dashboard, and pointed his revolver through the windshield at the defendant. The defendant was not arrested until he exited the vehicle and narcotics, that he was carrying on his person, fell to the ground. The second officer held his drawn gun on the passenger in his attempt to remove this individual from the car. The *White* panel held that the encounter was an investigatory stop rather than an arrest:

"Though this case would be easier if it involved a dark and deserted spot or one lone officer facing a [car full] of suspects, our reluctance to second-guess the judgment of experienced officers is not limited to such extreme situations. ... Reviewing the situation through the 'eyes of a reasonable and cautious police officer on the scene, guided by his experience and training,' we cannot say that the officers acted unreasonably in being prepared for possible violence.... [I]f the officers had sufficient cause to make a Terry stop ... we cannot conclude that simply having their guns drawn and ready would by itself convert the stop into an arrest."[25]

*Roper*, 702 F.2d at 988 (quoting *White*, 648 F.2d at 36 (footnotes omitted) (emphasis added)). In holding that the sole officer awaiting assistance and holding a gun on two vehicle occupants, only one of whom subsequently was arrested, was an investigative stop, this court recognized that " 'the better view is that the use of guns in connection with a stop is permissible where the police reasonably believe they are necessary for their protection.' " *Roper*, 702 F.2d at 988 (quoting *United States v. Merritt*, 695 F.2d 1263, 1273 (10th Cir.1982), *cert. denied*, 461 U.S. 916, 103 S.Ct. 1898, 77 L.Ed.2d 286 (1983)). Clearly, this circuit condoned officers' having drawn weapons

---

**25.** This court also held in 1983, that a police officer conducted an appropriate *Terry* investigatory stop, when he had reasonable suspicion in approaching an occupied car with his gun drawn and requiring the driver to exit and to assume a "spread" position while the officer frisked him:

The use of a gun in connection with a stop is permissible when the officer reasonably believes it is necessary for his protection. [The police officer] was alone in his patrol car

at around three o'clock in the morning. He stopped a vehicle containing three adult males, suspecting that the occupants had been involved in criminal activity. Approaching [the defendant driver's] vehicle with his gun drawn and ordering the driver out of the car were reasonable under the circumstances and did not constitute an arrest.

*United States v. Aldridge*, 719 F.2d 368, 371–72 (11th Cir.1983) (citations omitted).

when approaching and holding individuals for an investigatory stop in May, 1985, when reasonably necessary for protecting an officer or maintaining order.[26] *See United States v. Nargi,* 732 F.2d 1102, 1106 (2d Cir.1984) (" '[T]here is no hard and fast rule concerning the display of weapons' in investigative stops." (quoting *United States v. Harley,* 682 F.2d 398, 402 (2d Cir.1982)).

■ Roy's requiring Courson along with her male companions to lie on the ground is the additional method that he used in conjunction with his drawn gun to subdue the three individuals while he awaited assistance for investigation and potential arrests.[27] The Ninth Circuit deter-

mined that an agent with reasonable suspicion was within the confines of a *Terry* investigative stop when he approached a vehicle with his gun drawn, aimed at the passenger, and, upon compliance after three orders to raise his hands, directed the passenger to lie face down in a ditch where he was handcuffed and frisked.[28] *United States v. Taylor,* 716 F.2d 701 (9th Cir. 1983). Similarly, a lone deputy, who made a legitimate *Terry* stop with reasonable suspicion, did not convert that stop into an arrest, when he noticed that the defendant and her passenger appeared to be intoxicated as they exited the vehicle, and he ordered them "to 'prone out' at gunpoint as a protective measure while he continued his investigation." [29] *United States v. Jacobs,*

**26.** In addition to the established law concerning use of weapons by law enforcement officers in an investigatory stop in May, 1985, the Supreme Court and this court subsequently have fortified the justification for the reasonableness of the use of weapons. The Supreme Court has instructed that an objective-reasonableness inquiry is to be used for analyzing Fourth Amendment claims of excessive force:

*[A]ll* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard....

. . . .

The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.... The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

As in other Fourth Amendment contexts, however, the "reasonableness" inquiry in an excessive force case is an objective one: *the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.*

*Graham v. Connor,* 490 U.S. 386, 395–97, 109 S.Ct. 1865, 1871–72, 104 L.Ed.2d 443 (1989) (emphasis added). The facts of each case obviously are critical in determining when force is excessive. This court has recognized that "force that may be considered excessive in one setting may be considered necessary and reasonable under different circumstances." *Popham v. City of Kennesaw,* 820 F.2d 1570, 1576 (11th Cir.1987). The Fifth Circuit has distinguished between the

use or the attempted use of a weapon and mere display by an officer in the line of duty. *Hinojosa v. City of Terrell,* 834 F.2d 1223, 1231 (5th Cir.1988). That court was unwilling to find that the display of weapons, "that only conditionally threatens actual force," was excessive force or even an unlawful assault under state law for an officer executing his responsibilities. *Id.*

**27.** Since the purpose of a *Terry* stop is "to allow the officer to pursue his investigation without fear of violence," the Supreme Court has held "that the policeman making a reasonable investigatory stop should not be denied the opportunity to protect himself from attack by a hostile suspect." *Adams,* 407 U.S. at 146, 92 S.Ct. at 1923. There is no "litmus-paper test" or "sentence or a paragraph" rule to determine when, given the "endless variations in the facts and circumstances," police-citizen encounters exceed the bounds of investigative stops. *Royer,* 460 U.S. at 506–07, 103 S.Ct. at 1329. Generally, officers may take steps "reasonably necessary to protect their personal safety and to maintain the status quo" so that the limited purpose of the stop may be accomplished. *United States v. Hensley,* 469 U.S. 221, 235, 105 S.Ct. 675, 684, 83 L.Ed.2d 604 (1985).

**28.** That Court also concluded that "requiring the suspect to lie down while a frisk is performed, if reasonably necessary, does not transform a *Terry* stop into an arrest," particularly when the suspect was " 'extremely verbally abusive' " and " 'quite rowdy.' " *United States v. Taylor,* 716 F.2d 701, 709 (9th Cir.1983).

**29.** We note that a Florida appellate court has used *Roper* and *Jacobs* as authority for holding that a valid *Terry* investigatory stop occurred when an officer, with his gun drawn, approached a suspect and required him "to lie face down on the ground." *State v. Ruiz,* 526 So.2d

715 F.2d 1343, 1346 (9th Cir.1983) (per curiam).

In this case, Roy was alone late at night at a vacant construction site when he stopped the vehicle containing Courson and her companions. They appeared to be uncooperative in not all exiting the vehicle until Roy's third command. Upon their exit, the three individuals appeared to be intoxicated. Roy reasonably suspected that they might have been connected with cultivated marijuana fields that he had under surveillance. As he approached the three people, he could not have known if they were armed. In the middle of the night, it is not unusual for a law enforcement officer to have his weapon drawn, when approaching individuals suspected of drug involvement. One of the males became unruly and verbally abusive. Roy chose to maintain order by requiring the three individuals to lie on the ground while he directed his shotgun toward them. They complied without Roy's physical contact. Roy's actions with respect to Courson and her companions, who were not arrested until later, complied with established Supreme Court and Eleventh Circuit law in May, 1985.

The circumstances in this case constituted the extreme situation noted by this court in *Roper*, where we must view the situation from the perspective of a reasonable and cautious law enforcement officer. Whether one of the male detainees became verbally abusive upon his exit from the vehicle or after he was required to lie on the ground is not significant in Roy's requiring the three to lie on the ground while he held his shotgun toward them. Whenever the abusive verbal behavior occurred, it served to confirm the measures that Roy had taken to protect himself against hostile conduct from three individuals whom he had not yet investigated.[30]

Roy was "acting under the exigencies of the immediate situation." *Hutton*, 919

F.2d at 1542. Officers react to circumstances that they encounter and the conduct of detainees may dictate a particular officer's response. In this situation, Roy, who was alone, had to handle the three individuals as a group with the same methods of maintaining order until assistance arrived. We cannot expect a lone officer to use different measures of restraint with multiple detainees, although a particular detainee is not arrested subsequently. Until an investigation is conducted, the officer cannot know the involvement of each detainee.

We find that there is no genuine issue of fact material to Roy's displaying his shotgun or requiring the individuals to lie on the ground. Courson has failed to carry her burden of establishing that Roy's conduct violated clearly established constitutional law. We conclude that Roy used no unreasonable force with respect to Courson and her companions.

### 3. *Abandonment*

▮ Courson claims that Roy's leaving her alone at the side of a highway late at night without transportation home after he informed her that she was free to go violated her Fourteenth Amendment rights. Having established that Roy was acting within his discretionary authority when he stopped the vehicle in which Courson was a passenger and detained her in conjunction with his request for assistance and investigation of the vehicle occupants, we similarly find that he was engaged in his authorized responsibilities when he told Courson that she was free to go. Accordingly, Roy has satisfied the first part of the *Zeigler/Rich* analysis.

The burden shifts to Courson to show that Roy violated clearly established constitutional law in May, 1985, in leaving her alone beside the highway without transpor-

---

170, 172 (Fla.Dist.Ct.App.), *review denied,* 534 So.2d 401 (Fla.1988), *cert. denied,* 488 U.S. 1044, 109 S.Ct. 872, 102 L.Ed.2d 995 (1989).

**30.** Roy's requiring the three individuals to lie down may also have served to protect them. It is undisputed that the two males were intoxicated, and Roy noticed that all three individuals appeared to have difficulty exiting the vehicle. While he was alone with these apparently intoxicated suspects awaiting assistance, Roy's securing them by requiring them to lie on the ground may have prevented at least the two males from wandering onto the highway.

tation home. Under qualified immunity analysis, Roy's conduct must be measured against clearly established law, or law that was sufficiently clear in May, 1985, so that a reasonable official would be aware that he was violating a protected constitutional right. *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987); *see Rich v. Dollar,* 841 F.2d 1558, 1564–65 (11th Cir.1988). If the law was clearly established, then the evaluation of Roy's conduct against that legal standard would determine his entitlement to qualified immunity. *See Rich,* 841 F.2d at 1564–65.

▮ In this circuit, however, "if the law is not clearly established, the official is entitled to summary judgment regardless

of factual disputes." *Ansley v. Heinrich,* 925 F.2d 1339, 1348 (11th Cir.1991) (citing *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738); *see Stewart v. Baldwin County Bd. of Educ.,* 908 F.2d 1499, 1503 (11th Cir.1990) ("If the law that the defendants allegedly violated was not clearly established, then the defendants are entitled to qualified immunity."); *see, e.g., Edwards v. Gilbert,* 867 F.2d 1271, 1275–77 (11th Cir.1989); *Clark v. Evans,* 840 F.2d 876, 882–84 (11th Cir.1988); *Muhammad v. Wainwright,* 839 F.2d 1422, 1424–25 (11th Cir.1987). No Supreme Court or Eleventh Circuit precedent existed in May, 1985, concerning a law enforcement officer's abandoning a passenger in a vehicle which was impounded and the other occupants arrested.[31] Under

---

**31.** In accord with our analysis that the law concerning abandoning a nonarrested passenger of an impounded vehicle was not clearly established is a recent Tenth Circuit case. *Hilliard v. City & County of Denver,* 930 F.2d 1516 (10th Cir.1991). In *Hilliard,* the female plaintiff was a passenger in an automobile, which was involved in a minor traffic accident. The male companion and driver was arrested for driving under the influence of alcohol, taken into custody, and removed from the scene. After the determination that the female passenger was too intoxicated to drive, the car in which she and her arrested companion were riding was impounded, and she was left in a high crime area. She subsequently was sexually assaulted and found the next morning naked, bleeding and barely conscious.

Distinguishing state-imposed confinement or custody cases, the *Hilliard* court concluded that "it was not clearly established in 1988 that someone whose person was not under some degree of physical control by the state or who was not involved in a fourth amendment search or seizure would have a clearly established, constitutionally protected liberty interest." *Id.* at 1520; *see Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) (The Supreme Court recognized a substantive due process liberty interest of a mentally retarded child, who was involuntarily committed to a state institution, in being safe in his environment.); *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (Prison officials who show deliberate indifference to a prisoner's serious illness or injury violate the Eighth Amendment.); *Taylor ex rel. Walker v. Ledbetter,* 818 F.2d 791, 794 (11th Cir.1987) (en banc) ("We hold that a child involuntarily placed in a foster home is in a situation so analogous to a prisoner in a penal institution and a child confined in a mental health facility that the foster child may bring a section 1983 action for violation of fourteenth amendment rights."). Two other cir-

cuit courts have found a personal security right in abandonment situations, although the state had not restricted the movement of the complaining parties. *Wood v. Ostrander,* 879 F.2d 583 (9th Cir.1989), *cert. denied,* — U.S. —, 111 S.Ct. 341, 112 L.Ed.2d 305 (1990) (After the arrest of an intoxicated male driver and impoundment of the vehicle in which she was riding, the female passenger, who was left on the roadside late at night where she was raped, raised a genuine factual dispute concerning whether the officer deprived her of her security interest in personal security.); *White v. Rochford,* 592 F.2d 381 (7th Cir.1979) (Minor children, who were left alone on a cold night on a busy Chicago freeway, when the driver was arrested, and one of whom required hospitalization for a week, stated a section 1983 claim.). The *Hilliard* court found that the fact that two other circuits had found a constitutional duty on the part of officers who abandoned passengers in cars when the driver was arrested and the car impounded "represents the essence of a legal question whose answer is not 'clearly established.'" *Hilliard,* 930 F.2d at 1520. Expressing concern in holding an officer responsible for unsettled constitutional law regarding abandonment, the *Wood* dissent stated:

> The State patently did not become the guarantor of [the female passenger's] safety when it arrested the drunken driver of the car in which she was riding. How could any reasonable police officer be aware that in not escorting [her] home, or taking her to a location she requested, he was violating her "constitutional right to be free from an unjustified intrusion into her personal security in violation of her liberty interest under the fourteenth amendment[?]"
>
> . . . .
>
> Just as the police officers are not held to the standards of legal scholars, neither should they be expected to analyze and parse an

qualified immunity analysis in this circuit, Roy is entitled to qualified immunity because a law enforcement officer cannot be held to a standard of conduct which is unsettled by the Supreme Court or this circuit at the time of his actions which are questioned.[32] *See Herren v. Bowyer*, 850 F.2d 1543, 1545–46 (11th Cir.1988); *Rich*, 841 F.2d at 1564–65.

Our analytical result may be viewed as harsh from a humanitarian perspective.[33] Although Courson was unharmed and not left in a dangerous area, we find Roy's failure to provide her transportation home or to a telephone to be disappointing conduct by a law enforcement officer and bad judgment. Nevertheless, we conclude that a law enforcement officer's failure to afford such transportation a passenger of a vehicle that is impounded and the other occupants arrested was not a constitutional violation actionable under section 1983 in May, 1985, when the abandonment in this case occurred. *See Hilliard v. City & County of Denver*, 930 F.2d 1516, 1521 (10th Cir.1991) ("While we are appalled by the conduct of the defendants in this case,

we note the danger of confusing the question of whether the plaintiff has state tort remedies with whether the plaintiff has stated a claim amounting to the deprivation of a constitutional right.").

## III. CONCLUSION

The only issue before us on this interlocutory appeal is whether Roy is entitled to qualified immunity on Courson's constitutional claims of seizure, unreasonable force and abandonment. We remand this case to the district court with directions to grant summary judgment to Roy on the basis of qualified immunity on these constitutional claims and to resolve or remand to state court the pendent state claims.[34] Accordingly, the district court's grant of summary judgment to Roy on Courson's claim of intentional infliction of emotional distress is AFFIRMED, the denial of summary judgment to Roy on the basis of qualified immunity as to Courson's constitutional claims of seizure, unreasonable force and abandonment is REVERSED, and the case is REMANDED for entry of summary judgment in favor of Roy on the basis of

opinion (that they never heard of) utilizing the legal skills and reasoning of an appellate judge.
*Wood*, 879 F.2d at 599–600, 604 (Carroll, J., dissenting).
Additionally, the Supreme Court has concluded that "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors." *DeShaney v. Winnebago County Dept't of Social Servs.*, 489 U.S. 189, 195, 109 S.Ct. 998, 1003, 103 L.Ed.2d 249 (1989). The *Hilliard* court bolstered its conclusion that the law regarding abandonment of a passenger of a vehicle, which was impounded, was not clearly established by the Supreme Court's expressed reason for granting certiorari in *DeShaney* as being "'[b]ecause of the inconsistent approaches taken by the lower courts in determining when, if ever, the failure of a state or local governmental entity or its agents to provide an individual with adequate protective services constitutes a violation of the individual's due process rights.'" *Hilliard*, 930 F.2d at 1520 (quoting *DeShaney*, 489 U.S. at 194, 109 S.Ct. at 1002). *DeShaney*, therefore, acknowledges that, from the Supreme Court's perspective, the law concerning a duty to provide protective services by a state or local government was unsettled when the facts of this case occurred in 1985.

**32.** We additionally note that clearly established law in this circuit may include court decisions of the highest state court in the states that comprise this circuit as to those respective states, when the state supreme court has addressed a federal constitutional issue that has not been addressed by the United States Supreme Court or the Eleventh Circuit.

**33.** We should not be understood as condoning Roy's leaving Courson beside the roadway without transportation home or to a telephone to summon assistance. With six law enforcement officers and four patrol cars on the scene, we are troubled that transportation was not provided to Courson, who was cooperative and not charged with any misconduct. Roy likely would not appreciate such disregard for his wife, daughter or sister.

**34.** The district court may elect to dismiss these claims in the absence of federal claims remaining in the case pursuant to our holding herein in the interest of judicial economy, or, in its discretion, may remand this case to state court for trial on the state claims, if it deems that course to be appropriate. *See Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988); *Williams v. Bennett*, 689 F.2d 1370 (11th Cir.1982), *cert. denied*, 464 U.S. 932, 104 S.Ct. 335, 78 L.Ed.2d 305 (1983).

qualified immunity and for disposition of the pendent state claims consistent with this opinion.