Brenda L. JACKSON, as Surviving Mother and Administratrix of the Estate of Willie Jerry Jackson, deceased, Quentin K. Wimbish, Toddrick R. Williams, Plaintiffs-Appellees,

v.

Willie T. SAULS, Ivant T. Fields, Waine L. Pinckney, Defendants-Appellants,

City of Atlanta, John Does 1-5, Defendants.

No. 98-8980.

United States Court of Appeals,

Eleventh Circuit.

March 17, 2000.

Appeals from the United States District Court for the Northern District of Georgia. (Nos. 97-00585-CV-RLV, 97-1351-CV-RLV), Robert L. Vining, Jr., Judge.

Before ANDERSON, Chief Judge, and COX and HULL, Circuit Judges.

HULL, Circuit Judge:

These § 1983 civil rights actions allege that three Atlanta police officers conducted an illegal investigatory stop and used excessive force during that stop. This appeal is from the district court's summary judgment order which held that the Defendant officers were not entitled to qualified immunity. After review, we affirm the district court's denial of summary judgment to Defendants on Plaintiffs' illegal stop claims but reverse the denial of summary judgment to Defendants on Plaintiffs' excessive force claims. We also reverse the district court's grant of summary judgment to Plaintiffs on Defendants' qualified immunity defenses.

I. FACTUAL BACKGROUND

This case concerns a shooting incident involving Jerry Jackson, Quentin Wimbish, and Toddrick Williams (collectively the "Plaintiffs") and Officers Sauls, Fields, and Pinckney (collectively the "Defendants").[1] Although the parties' versions of the shooting incident differ drastically, the summary

[1]This appeal involves two separate civil actions. Brenda Jackson, as surviving mother and administratrix of the estate of Jerry Jackson, sued the three police officers in one case, No. 97-585-CV-RLV, and Quentin Wimbish and Toddrick Williams sued them in another case, No. 97-1351-CV-RLV. The district court consolidated these cases for discovery and in a single order ruled on the summary judgment motions in both cases. Although Brenda Jackson, as administratrix, is technically the plaintiff in Case No. 97-585-CV-RLV,

judgment posture of this case requires us to consider first the events in the light most favorable to Plaintiffs. We then examine Defendants' qualified immunity defenses.

*A.     The Initial Encounter*

At approximately 11:00 a.m. on December 7, 1995, Plaintiffs Jackson, Wimbish, and Williams and their friend Corey Dean, young African-American males, were in Jackson's blue Pontiac 6000, bearing Georgia tag number 8BK94. No one was armed. Driving east on Bankhead Highway, Jackson was on his way to the Moto Cycle Shop at 441 Marietta Street to check on his motorcycle. Jackson left his motorcycle at the Shop for repairs and, that morning, spoke to the Shop's owner about the estimated repair cost.

That day, Defendants Sauls, Pinckney, and Fields, also African-American males, were operating undercover in plain clothes and were in an unmarked gray Pontiac 6000 traveling east on Bankhead Highway. As members of a Field Investigation Team ("Team") of the Atlanta Police Department ("APD"), they were assigned to the 1995 APD Crime Suppression Task Force. The Task Force's mission was to seek out street crimes on a broad and proactive basis.[2] Defendants were on their way to meet with their supervisor to receive their assignments for the day. Defendant Fields, the senior officer in the group, was driving the gray Pontiac 6000, was armed with a nine millimeter pistol, and was wearing a black cap, a gray plaid shirt, blue jeans, and boots. Defendant Sauls was in the front passenger seat, was armed with a nine millimeter pistol and a .38 caliber revolver, and was wearing a green sweatshirt, blue jeans, and boots. Defendant Pinckney was sitting in the back seat, was armed with a nine millimeter pistol, and was wearing earrings, a brown cap, a navy blue sweatshirt, blue jeans, and boots.

_____

the collective term "Plaintiffs" in this opinion includes her son, as opposed to her, because the events at issue involved his actions. While a party to both cases, the City of Atlanta is not involved in this appeal.

[2]A March 1994 memorandum, entitled "Crime Suppression Team Plan of Action," stated:

> The mission is to be proactive and prevent crime from occurring by increased visibility of police, surveillance of areas where data suggests crimes may occur, and identifying persons likely involved in the commission of crimes.

Each Defendant officer had served about one month in a plainclothes law enforcement capacity and did not have any specialized training beyond that received during the police academy basic training program. Prior to this shooting incident, some other Team members had expressed concern that Defendants were too aggressive. Additionally, Officer Fields had a history of complaints against him. Officers Sauls and Pinckney had been disciplined for abusing their authority and failing to conform to directives arising from an incident during which they forced third parties to the floor for half an hour.[3]

While the two Pontiacs were traveling down Bankhead Highway, Defendants' gray Pontiac approached Plaintiffs' blue Pontiac from behind. Defendants do not claim that Plaintiffs were driving erratically or unlawfully. Instead, Defendants assert that they drew closer to Plaintiffs' blue Pontiac because they thought that its occupants might be fellow Team members. Defendants based this assumption on their knowledge that the Pontiac 6000 is a popular model of car for police undercover work.

Defendants claim that as they approached Plaintiffs' car, the driver Jackson kept looking in the rearview mirror; however, this is disputed. All agree, however, that the officers' gray Pontiac pulled along side Plaintiffs' blue Pontiac. According to Defendants, this made the occupants of the blue Pontiac nervous and Defendants attributed this nervousness to their assumptions that the occupants recognized Defendants as police officers. Defendant Sauls claims that he saw one of the occupants nudge Jackson and mouth the words "Oh shit," but Plaintiff Williams avers that there was no conversation in the blue Pontiac about the officers' gray Pontiac. Although Defendant Pinckney claims that Plaintiff Wimbish stared at him, Wimbish testified only that he "looked back" at one of the occupants, presumably Pinckney, who had looked at him first. Defendants also claim that the occupants in the blue Pontiac looked around but tried not to make eye contact with Defendants.

---

[3]This prior complaint evidence was in the summary judgment record, was not challenged, and thus we include it; however, nothing herein should imply whether this evidence is admissible at trial.

As Plaintiffs' blue Pontiac continued east on Bankhead Highway and turned south onto Marietta Street toward the Moto Cycle Shop, Defendant Fields followed in the gray Pontiac and then drove in front of the blue Pontiac. Officer Sauls claims that it was at some point during his observation of the occupants of the blue Pontiac that he recalled that a Pontiac 6000 was an easy car to steal. Defendants did not recognize anyone in the blue Pontiac. No one in blue Pontiac recognized Defendants or assumed that Defendants were undercover police officers. By the time the two cars approached the Moto Cycle Shop, Defendant Fields' gray Pontiac was in front of the blue Pontiac. According to Defendants, at some point they decided to move on because they realized that the occupants of the blue Pontiac were not fellow police officers.

B.      *The Parking Lot*

While the officers' car continued on, Jackson turned the blue Pontiac left into the parking lot of the Moto Cycle Shop. The parking lot was on the south side of the shop which faced west toward Marietta Street. Jackson parked next to a dumpster in the parking lot. The three Plaintiffs and Dean got out of their car and walked into the Moto Cycle Shop to check on Jackson's motorcycle. Also present in the Shop were the owner Robert Lebus, and mechanics Tony Delly, Danny Jackson, Thomas Stearns, and Tony Thompson.

After realizing that Jackson's blue Pontiac was no longer behind them, Officer Fields turned his gray Pontiac around and drove to the parking lot next to the Moto Cycle Shop. Defendants based their decision to turn around on a suspicion that the blue Pontiac had been stolen. Defendants aver that their suspicion was based on their observation of the alleged nervousness of the occupants, their knowledge that the Pontiac 6000 is an easy car to steal, and their assertion that the blue Pontiac made such an abrupt turn into the parking lot. However, Plaintiffs' evidence shows that their blue Pontiac turned in a regular fashion and reveals no nervousness by its occupants.

After reaching the Moto Cycle Shop's parking lot, Officer Fields pulled his vehicle up on the sidewalk to the rear of Jackson's car partially blocking its movement from the parking lot. Officer Sauls got out of the car and inspected the empty blue Pontiac. There was no physical evidence indicating that Jackson's

4

blue Pontiac had been stolen, such as a broken window or broken ignition, nor was the door ajar.[4] Officer Sauls also looked in the dumpster but did not find anything suspicious. Neither Sauls, Pinckney, nor Fields called into the APD dispatcher to advise of their stop, its purpose, or its location. The officers had no outside information that Jackson or any of his friends had committed any criminal acts or were about to commit any criminal acts. At some point, Officer Pinckney called in a registration check on the blue Pontiac's license plate.[5]

C.      *The Moto Cycle Shop*

Approximately one minute after Defendants arrived at the parking lot of the Moto Cycle Shop, there was a two-car wreck at a nearby intersection. The crash was loud enough to be heard by the people inside the Moto Cycle Shop and by other persons in the area. Plaintiffs, their friend Dean, and mechanic Delly had been looking at motorcycles, and, in response to the wreck, they walked outside onto the sidewalk in front of the Moto Cycle Shop. They looked toward the accident scene at the intersection of Marietta and Jones Streets, which was in the opposite direction of the parking lot, the two Pontiacs, and the Defendant officers.

After hearing the wreck, Defendants observed that some of the men exiting the Moto Cycle Shop appeared to be the men who had been in the blue Pontiac. According to Plaintiffs, the blue-jean-clad Defendants had their police badges concealed so that nothing visually identified them as police officers. With guns drawn, the three Defendants then approached the men outside and did not verbally identify themselves

_____

[4]Sauls and Pinckney testified that their suspicion about the blue Pontiac being stolen was increased because after its occupants appeared to recognize them as police officers, Jackson abruptly turned into the parking lot, and the occupants abandoned the blue Pontiac leaving the driver's door ajar and a jacket or shirt hanging out of the door. However, a photograph taken after the shooting by an amateur photographer from a nearby building shows that the door of the blue Pontiac was closed and that there was no clothing hanging out of the door.

[5]Apparently all the Detective Radio Transcript provides is the APD dispatcher's repeating the tag number. Pinckney testified that he was on the radio during the period when Sauls was inspecting the car and approaching the Moto Cycle Shop. Plaintiffs, however, testified that the three officers approached the shop at the same time. If so, Pinckney was present when the shooting began and the call must have gone in at some other time. In any event, it is undisputed that the response that the blue Pontiac was not stolen and was registered to Jackson did not come in until after the shooting was over.

5

as police officers. Defendants yelled and cursed at everyone to get back into the Shop and lie down. Officer Sauls stood in the doorway facing the inside of the Shop. Officers Fields and Pinckney were behind Sauls with Fields on the right and Pinckney on the left.[6] While in the doorway, Defendants swept the Shop's interior with their guns.

There is considerable testimony that at this point everybody in the Moto Cycle Shop thought that Defendants were armed robbers about to harm them because the Defendants yelled obscenities at them, screamed at them to get on the floor, and never identified themselves as police officers. Jackson, Wimbish, Williams, and mechanic Delly went to the floor as ordered. Plaintiffs' friend Dean ran to the rear of the Shop. Mechanic Stearns ducked behind some motorcycles in the Shop. There was substantial confusion within the Shop.

D.      *The Shooting*

Believing Defendants were armed robbers about to harm the Moto Shop's occupants, mechanic Stearns, a Caucasian male, drew his nine millimeter handgun and fired a three-round burst at Officer Sauls. It is undisputed that Stearns shot first and was licensed to carry a concealed weapon. Stearns then retreated behind a row of motorcycles inside the Shop where he could not be seen from Marietta Street. Two of Stearns's bullets hit Officer Sauls in the abdomen. Sauls began to retreat across Marietta Street and initially fired two or three shots toward the doorway of the Shop. According to Plaintiffs, Sauls fired his shots despite the fact that Stearns, the man with the gun, was no longer in view and only Jackson, Wimbish, Williams, and Delly lying on the floor could be seen from the street. Indeed, Stearns was never shot. Instead, one of Sauls's shots hit Plaintiff Wimbish in the leg as he lay on the ground unarmed. Officer Sauls fired his remaining

---

[6]Under Defendants' version of the events, Pinckney and Fields stayed near their police vehicle and were not with Sauls when Sauls initially drew his weapon or when Stearns fired at Sauls. Instead, when the shooting erupted, Pinckney was radioing in the license plate and Fields was chasing Dean around the back of the Shop. Nonetheless, the evidence favorable to Plaintiffs places both Pinckney and Fields at the doorway of the Shop when the shooting erupted.

rounds toward the doorway while he was running north on Marietta. Sauls eventually collapsed up the street in a store front.

After the shooting erupted, Officers Pinckney and Fields moved to the south of the doorway closer to the parking lot and the two Pontiacs. Plaintiffs contend that Officer Pinckney initially was not aware that Sauls had been hit.[7] Pinckney stood at the curb close to a telephone pole near the southwest corner of the shop. Plaintiff Jackson, who was lying closest to the door when the shooting erupted, attempted to crawl outside the shop. Seeing Officer Pinckney with his gun drawn, Jackson, unarmed, dropped to the ground with his face down. Pinckney was about thirteen feet from Jackson and fired twice toward him.[8] Pinckney's bullets hit the sidewalk inches from Jackson's head and ricocheted up, piercing Jackson in the upper right arm and base of the neck. Pinckney ran to the dumpster abutting the southwest corner of the Shop where he could still see Jackson.

Officer Fields then approached Jackson, as Jackson attempted to crawl back into the Shop. Officer Fields pointed a gun at Jackson as though he was going to shoot him again, but he did not. It is undisputed that Officer Fields never fired his weapon, that only Pinckney's bullets hit Jackson, and that Jackson died at the scene as a result of injuries from Pinckney's bullets. According to Plaintiffs, Defendants never verbally or otherwise identified themselves as police officers during any of this gunfire. Other witnesses testified that Sauls and Fields pulled their police badges from underneath their shirts only after the shooting.

E.      *Post-Shooting Activity*

---

[7]Officer Pinckney testified that he saw Sauls doubled over, knew Sauls had been hit, and radioed in "I've got one down." Nonetheless, in this summary-judgment posture, Plaintiffs argue, and the inference we must make in Plaintiffs' favor, is that this "one" referred to Jackson, not Sauls, indicating that Pinckney did not know Sauls had been hit.

[8]Pinckney avers that his shots were cover fire for Sauls and that he saw the muzzle of a gun in the doorway near Jackson. Plaintiffs emphasize, however, that no gun or any object resembling a gun was located on Jackson or in the doorway.

7

Following the shooting, Officer Pinckney radioed to report the incident. He did not request back-up and did not report specifically that Officer Sauls had been hit. Instead, Pinckney reported that "I got one down," which could have meant Jackson or Sauls. In this summary judgment posture, we must infer it meant Jackson. Also, immediately after the shooting, Lebus, the owner of the Shop, called 911 and stated: "Some [expletive deleted] guys came in here and just started popping rounds in." Because Lebus did not identify the shooters as police officers, this circumstantially supports Plaintiffs' testimony that Defendants never identified themselves as police officers.

Plaintiff Wimbish, shot in the leg and unarmed, was placed under arrest for aggravated assault and was transferred to the hospital. Plaintiffs' friend Dean, also unarmed, was arrested for aggravated assault. Although arriving at the scene after the shooting was over and the scene was taped off, George Jackson, an African-American male, was taken into custody and questioned. Stearns, a Caucasian male, fired the first shots but was not arrested. No weapons were found on Plaintiffs or anyone in the Shop except Stearns.

Subsequently APD's Office of Professional Standards ("OPS") investigated the shooting incident and initially recommended charging Officers Sauls and Pinckney with multiple work rule violations, including violations based on the fact that "there was not at this time period reasonable suspicion to make a[T]erry stop and frisk." The initial findings also reported that Officers Sauls and Pinckney had not been truthful in their statements to OPS and the Homicide Division. However, OPS's final recommendation was that only Officer Pinckney be charged and only with work rule violation 6.09, Use of Firearms.[9] This recommendation was accepted and Officer Pinckney was suspended for five days. The Fulton County District Attorney's Office, the Federal Bureau of Investigation, and Georgia Bureau of Investigation investigated the shooting incident, but no criminal charges were filed against any officer.

_____

[9]The APD Notice of Final Adverse Action, dated October 7, 1996, states:

> At approximately 11:00 am on December 7, 1995, even though you were acting in the defense of a fellow officer, you still endangered the lives of innocent persons when you discharged your 9mm toward the front entrance of 441 Marietta Street.

8

## II. PROCEDURAL HISTORY

In these § 1983 civil actions, Plaintiffs claim that the Defendant officers violated their rights under the Fourth Amendment and the Due Process Clause of the Fourteenth Amendment by illegally stopping and seizing them at the Moto Cycle Shop and by employing excessive force during that stop.  Plaintiffs also claim that Defendants used race as a basis for this stop, thereby violating their rights under the Equal Protection Clause of the Fourteenth Amendment.  Plaintiffs further assert state law claims.

After extensive discovery, all parties moved for summary judgment on Defendants' qualified immunity defenses.  The district court's order denied Defendants' summary judgment motions based on qualified immunity to Plaintiffs' illegal stop and excessive force claims and granted Plaintiffs' similar summary judgment motion.[10]  Defendants timely appealed.

## III. STANDARD OF REVIEW

The district court's order addressing Defendants' qualified immunity defenses to these § 1983 claims is an appealable interlocutory order.  *See, e.g., Mitchell v. Forsyth,* 472 U.S. 511, 530, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) ("[A] district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision'...."); *Jones v. Cannon,* 174 F.3d 1271, 1280 (11th Cir.1999).  This Court reviews *de novo* the district court's denial of qualified immunity.  *Macuba v. Deboer,*

---

[10]The district court's order discusses only the illegal stop and excessive force claims, does not discuss the Equal Protection claim, and states that the district court "reserves its ruling on the remainder of the defendants' motions."  On appeal Pinckney's brief does not ask us to address the equal protection claim, but Sauls and Fields's brief does contend, albeit in a summary manner, that the district court "erred in that it failed to even address Appellants' entitlement to qualified immunity on the equal protection claim."  We agree that the district court so erred.  *See Anderson v. Creighton,* 483 U.S. 635, 646 n. 6, 107 S.Ct. 3034, 3042 n. 6, 97 L.Ed.2d 523 (1987) ("Because 'one of the purposes of the *Harlow* qualified immunity standard is to protect public officials from the "broad-ranging discovery" that can be "peculiarly disruptive of effective government" '... we have emphasized that qualified immunity questions should be resolved at the earliest possible stage of a litigation.");  *Cottrell v. Caldwell,* 85 F.3d 1480, 1487 (11th Cir.1996).  Thus, we remand that claim with instructions that the district court rule on Defendants' motions for summary judgment based on their qualified immunity defenses to Plaintiffs' equal protection claim.

193 F.3d 1316, 1320 (11th Cir.1999).  For summary judgment purposes, the facts are viewed in the light most favorable to the nonmoving party.  *Jones,* 174 F.3d at 1281.

IV. QUALIFIED IMMUNITY PRINCIPLES

Qualified immunity shields a § 1983 defendant from liability for harms arising from discretionary acts,[11] as long as the discretionary acts do not violate clearly established federal statutory or constitutional rights of which a reasonable person would have known.  *See Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982);  *Jenkins by Hall v. Talladega City Bd. of Educ.,* 115 F.3d 821, 823 (11th Cir.)(en banc), *cert. denied,* 522 U.S. 966, 118 S.Ct. 412, 139 L.Ed.2d 315 (1997).  For an asserted right to be clearly established for purposes of qualified immunity, "the law must have earlier been developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that 'what he is doing' violates federal law."  *Lassiter v. Alabama A & M Univ. Bd. of Trustees,* 28 F.3d 1146, 1149 (11th Cir.1994) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)).  The burden of showing that an officer violated clearly established law falls on the plaintiff, and a plaintiff's citation of general rules or abstract rights is insufficient to strip a § 1983 defendant of his qualified immunity.  *See Anderson,* 483 U.S. at 639, 107 S.Ct. 3034; *Jones v. Cannon,* 174 F.3d 1271, 1282 (11th Cir.1999);  *Walker v. Schwalbe,* 112 F.3d 1127, 1132 (11th Cir.1997).  A reasonable officer's awareness of the existence of an abstract right, such as a right to be free of excessive force or an investigatory stop without reasonable suspicion, does not equate to knowledge that his conduct infringes the right.  "If case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant."  *Pickens v. Hollowell,* 59 F.3d 1203, 1206 (11th Cir.1995) (quoting *Post v. City of Fort Lauderdale,* 7 F.3d 1552, 1557 (11th Cir.1993)).

---

[11]Plaintiffs do not dispute the fact that the Defendant officers were within the scope of their discretionary authority at all relevant times.

Additionally, the standard for determining if an officer violated clearly established law is an objective one and does not include inquiry into the officer's subjective intent or beliefs. *Von Stein v. Brescher,* 904 F.2d 572, 579 (11th Cir.1990). Thus, a police officer is entitled to qualified immunity if a reasonable police officer could have believed his or her actions were lawful in light of clearly established law and the information possessed by the officer at the time the conduct occurred. *See Stewart v. Baldwin County Bd. of Educ.,* 908 F.2d 1499, 1503 (11th Cir.1990).

Against this background, we outline why the district court correctly denied Defendants' qualified immunity motions regarding Plaintiffs' illegal stop claims but incorrectly denied those motions regarding Plaintiffs' excessive force claims.

## V. INVESTIGATORY STOP

"[A]n officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow,* --- U.S. ----, 120 S.Ct. 673, 675, --- L.Ed.2d ---- (2000) (citing *Terry v. Ohio,* 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)).[12] Furthermore, "[w]hile 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." *Id.* 120 S.Ct. at

---

[12]Defendants' investigatory stop is governed by the Fourth Amendment which provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. "This inestimable right of personal security belongs as much to the citizen on the streets of our cities as to the homeowner closeted in his study to dispose of his secret affairs." *Terry v. Ohio,* 392 U.S. 1, 8-9, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The Supreme Court recently reaffirmed that "a brief encounter between a citizen and a police officer on a public street, is governed by the analysis ... first applied in *Terry.*" *Illinois v. Wardlow,* --- U.S. ----, 120 S.Ct. 673, 675, --- L.Ed.2d ---- (2000). While there are circumstances under which a person may be briefly detained without probable cause to arrest him, "any curtailment of a person's liberty by the police must be supported at least by a reasonable and articulable suspicion that the person seized is engaged in criminal activity." *Reid v. Georgia,* 448 U.S. 438, 440, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980). This prohibition of searches and seizures that are not supported by some objective justification is applicable to the states through the Fourteenth Amendment, *see Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), and "governs all seizures of the person, including seizures that involve only a brief detention short of traditional arrest." *Reid,* 448 U.S. at 440, 100 S.Ct. 2752.

675-76 (citing *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989)).  A law enforcement official who reasonably but mistakenly concludes that reasonable suspicion is present is still entitled to qualified immunity.  When an officer asserts qualified immunity, the issue is not whether reasonable suspicion existed in fact, but whether the officer had "arguable" reasonable suspicion to support an investigatory stop.  *See Williamson v. Mills,* 65 F.3d 155, 157 (11th Cir.1995);  *Swint v. The City of Wadley, Alabama,* 51 F.3d 988, 996 (11th Cir.1995);  *Post v. City of Fort Lauderdale,* 7 F.3d 1552, 1558 (11th Cir.1993).

*A.    Timing of the Stop*

We first examine at what point during the encounter Plaintiffs were actually detained.  As the *Terry* Court observed, "[i]t must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." *Terry,* 392 U.S. at 16, 88 S.Ct. 1868.  It is only when an officer, "by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Id.* at 19 n. 16, 88 S.Ct. 1868;  *see also Courson v. McMillian,* 939 F.2d 1479, 1488 (11th Cir.1991).  Plaintiffs and Dean freely exited their blue Pontiac and walked into the Moto Cycle Shop. Officer Fields's positioning the gray Pontiac to impede the movement of the unoccupied blue Pontiac did not "seize" the Plaintiffs.  Instead, the stop here did not take place until the three police officers, with guns pointed, ordered with profanity that Plaintiffs lie on the floor.  Therefore, we focus on the constitutionality of that action by the officers.

We recognize Defendants' contention that Officer Sauls alone approached the Shop's doorway and ordered Plaintiffs to lie on the ground, while Officer Fields chased Corey Dean and Officer Pinckney radioed in the license plate check.  However, viewed in a light most favorable to Plaintiffs, the evidence shows that Officers Pinckney and Fields, with guns drawn, were immediately behind and to the left and right, respectively, of Officer Sauls when Sauls, with a gun drawn, approached Plaintiffs.  Thus, we must view the evidence as showing that all three officers acted in concert in brandishing their weapons, ordering Plaintiffs

12

to the ground, and conducting this investigatory stop. The next question is whether they possessed arguable reasonable suspicion for their stop.

B.      *Arguable Reasonable Suspicion*

Whether arguable reasonable suspicion existed for Defendants' investigatory stop depends on whose version of events a jury believes. Plaintiffs' version, if credited, shows no arguable reasonable suspicion. According to their evidence, Plaintiffs traveled from Jackson's home to the Moto Cycle Shop, obeyed all traffic laws, acted normally without any nervousness, turned into the parking lot because they reached their destination, parked their car in a normal manner with all doors completely shut, entered a business expecting them, heard a loud crash, came out to look at the accident, were approached by three unidentified, gun-toting, blue-jean clad strangers yelling obscenities and ordering them to get on the ground. Under Plaintiffs' version, Dean ran only after the three strangers drew their weapons and ordered, with profanity, that everyone lie down. Indeed, the Shop's occupants believed that the strangers were armed robbers about to harm them. If a jury were to credit Plaintiffs' evidence, then Defendants had no basis for their actions. Thus, a reasonable police officer would have known that he lacked reasonable suspicion for stopping Plaintiffs and that he was violating clearly established law in doing so. *See Reid v. Georgia,* 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980); *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *United States v. Smith,* 799 F.2d 704, 707 (11th Cir.1986). Therefore, the district court correctly denied Defendants' motions for summary judgment on their qualified immunity defenses to Plaintiffs' illegal stop claims.[13]

C.      *Plaintiffs' Summary Judgment Motion*

This case is unusual in that Plaintiffs filed their own joint motion for summary judgment addressing qualified immunity. In addition to denying Defendants' motions, the district court granted Plaintiffs' motion,

---

[13]Under this Circuit's law, Defendants' drawing their guns and ordering Plaintiffs to lie down did not convert this investigatory stop or seizure into an arrest. *See Courson v. McMillian,* 939 F.2d 1479, 1493 (11th Cir.1991); *United States v. Roper,* 702 F.2d 984, 987 (11th Cir.1983) (an officer's drawing his weapon and ordering two unarmed occupants to exit a vehicle did not convert the investigatory stop into an arrest); *accord United States v. Pantoja-Soto,* 768 F.2d 1235, 1236 (11th Cir.1985).

13

in effect striking Defendants' qualified immunity defenses as a matter of law. The district court, however, erred in doing so because Defendants' different sequence of events, if credited by a jury, clearly establishes arguable reasonable suspicion for the stop here and would entitle Defendants to qualified immunity on Plaintiffs' illegal stop claims. *See Wardlow,* 120 S.Ct. at 675-76.[14]

In their testimony, Defendants explain why they followed and drew close to Plaintiffs' blue Pontiac, and how Defendants thought certain occupants recognized them as being police officers, looked nervous, and refused to make eye contact with the officers. After pulling ahead in traffic, Defendants were watching through the rearview mirror and saw Plaintiffs' blue Pontiac appear to take evasive action by turning abruptly into a side street. The Defendants doubled back and found the blue Pontiac in a parking lot. To them the blue Pontiac had the look of a stolen car rapidly abandoned because a door was ajar with an item of clothing hanging outside.

The Defendants further aver that their police badges were visible on the outside of their clothing, that only Sauls approached the Plaintiffs, that Fields and Pinckney remained in the parking lot, that Sauls identified himself as a police officer, that Dean then fled, and that only then did Sauls, fearing for his safety, unholster his weapon and order Plaintiffs to the ground. Sauls also testified that he never pointed his gun at the men, but kept it at a 45-degree angle. According to Defendants, Sauls had re-holstered his weapon and was reaching down to pat down the men when Stearns shot. Only after being shot did Sauls unholster his weapon and return fire. Furthermore, when Stearns shot, Fields was chasing Dean, and Pinckney was

---

[14]In *Wardlow,* the defendant moved to suppress a gun recovered during a protective pat-down search. The search was incident to his being stopped because he fled upon observing a police caravan. Prior to his flight, the defendant was standing next to a building holding an opaque bag. The state court suppressed the gun, holding sudden flight in a high crime area does not create a reasonable suspicion for a *Terry* stop. *Wardlow,* 120 S.Ct. at 675. The Supreme Court disagreed and held that a defendant's presence in a heavy-narcotics-trafficking area and his unprovoked flight upon noticing the police were sufficient to create reasonable suspicion. *Id.* at 676. The Court also observed that "[o]ur cases have also recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." *Id.*

14

radioing in the license plate of Plaintiffs' car. Officers Fields and Pinckney did not approach the Shop and

unholster their weapons until after Stearns shot.

Plaintiffs' evidence contradicts this account of the shooting incident. Nonetheless, Defendants'

version of events, if credited by a jury, establishes arguable reasonable suspicion for the stop. Therefore, we

find that the district court erred in granting summary judgment for Plaintiffs on Defendants' qualified

immunity defenses to Plaintiffs' illegal stop claims.

## VI. DAMAGES AND CAUSATION

Before leaving Plaintiffs' illegal stop claims, we address a causation issue. Even if under Plaintiffs'

evidence a reasonable police officer would have known that he violated clearly established law in making this

stop, Defendants claim that Jackson's death and Wimbish's injuries were caused by Stearn's shooting and not

their illegal stop, and thus Defendants are entitled to summary judgment on qualified immunity grounds for

any damages arising from Jackson's death and Wimbish's injuries. However, we find that Plaintiffs' evidence

is sufficient to create jury issues regarding whether Defendants' illegal stop proximately caused Jackson's

death and Wimbish's injuries and the damages flowing therefrom.[15] In so finding, we are guided by certain

common law tort principles of damages and causation which apply in this § 1983 context. *See, e.g., Memphis*

*Community School Dist. v. Stachura,* 477 U.S. 299, 305-06, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986).

---

[15]The sufficiency of the evidence issues related to whether Defendants' allegedly illegal stop caused Jackson's death and Wimbish's injuries are "inextricably intertwined" or "part and parcel" of the core qualified immunity issues in this case. *See Cottrell v. Caldwell,* 85 F.3d 1480, 1489-92 (11th Cir.1996) (in an interlocutory appeal, turning first to plaintiff's evidence of the constitutional violation itself and holding that "plaintiff has failed to show a violation of due process, and it necessarily follows that the defendants are entitled to summary judgment on qualified immunity grounds"); *Dolihite v. Maughon,* 74 F.3d 1027, 1033 n. 3 (11th Cir.1996) (in an interlocutory appeal, focusing on the "predicate element of the underlying constitutional tort," which is "part and parcel of the core qualified immunity issue which is immediately appealable" or is "inextricably intertwined" with the core issue); *Adams v. Poag,* 61 F.3d 1537 (11th Cir.1995) (in an interlocutory appeal, holding defendants are entitled to qualified immunity because plaintiffs failed to present evidence of deliberate indifference to support their Eighth Amendment claim). *See also, e.g., Campbell v. Sikes,* 169 F.3d 1353, 1361-63 (11th Cir.1999); *Mencer v. Hammonds,* 134 F.3d 1066, 1069-71 (11th Cir.), *cert. denied,* --- U.S. ----, 119 S.Ct. 445, 142 L.Ed.2d 399 (1998); *Johnson v. Clifton,* 74 F.3d 1087, 1090-91 (11th Cir.1996).

Although § 1983 addresses only constitutional torts, § 1983 defendants are, as in common law tort suits, responsible for the natural and foreseeable consequences of their actions. *See Malley v. Briggs,* 475 U.S. 335, 344-45 n. 7, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) (stating that " § 1983 should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions") (citing *Monroe v. Pape,* 365 U.S. 167, 187, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961)); *see also Carey v. Piphus,* 435 U.S. 247, 255-59, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). For damages to be proximately caused by a constitutional tort, a plaintiff must show that, except for that constitutional tort, such injuries and damages would not have occurred and further that such injuries and damages were the reasonably foreseeable consequences of the tortious acts or omissions in issue.[16]

Plaintiffs contend that Defendants' illegal stop set off and caused the chain reaction of Stearns's shooting and hitting Sauls, Sauls's shooting and hitting Wimbish, and Pinckney's shooting and killing Jackson. According to the Plaintiffs and other witnesses, Defendants in plain clothes never identified themselves as police officers, drew their guns, yelled obscenities, and ordered the Shop's occupants to lie down on the floor. Only then did Stearns shoot, fearing for his safety and believing that the blue-jean-clad Defendants were armed robbers about to harm them. Plaintiffs assert that Stearns's three round burst was his effort to escape injury from armed robbers and was directly caused by Defendants' illegal stop. Plaintiffs stress that Defendants' illegal stop not only caused Stearns to shoot but also created the need for the officers to use deadly force in responding to Stearns and thus caused Jackson's death and Wimbish's injuries. Therefore, Plaintiffs argue, and we agree, that jury issues exist regarding whether, except for Defendants'

---

[16]Under traditional tort principles, causation has two required elements: cause-in-fact and legal or proximate cause. *See* W. Page Keeton, et al., *Prosser and Keaton on the Law of Torts,* §§ 41-42, at 263-80 (5th ed.1984). A plaintiff must first show that the constitutional tort was a cause-in-fact of the injuries and damages claimed. To establish cause-in-fact, the plaintiff must show that except for the constitutional tort, such injuries and damages would not have occurred. *Id.* Secondly, a plaintiff must show that the constitutional tort was the legal or proximate cause of the injuries and damages claimed. An act or omission is a legal or proximate cause of a plaintiff's injuries or damages if it appears from the evidence that the injury or damage was a reasonably foreseeable consequence of the act or omission. *Id.*

16

illegal stop, Stearns would not have shot, the officers would not have shot back, and Jackson's death and Wimbish's injuries would not have occurred.

Plaintiffs further argue that their evidence also raises jury issues regarding foreseeability and whether Stearns's shooting, the officers' shooting back, and Jackson's death and Wimbish's injuries were natural and foreseeable consequences of the officers' illegal stop. We first caution that a police officer cannot foresee all conduct occurring after a stop or arrest, even if illegal. For example, when a uniformed officer, or an undercover officer identifying himself as a policeman, draws his gun during an illegal stop or arrest, third party civilians and detained persons do not normally begin shooting. Thus, in those situations, an officer would not reasonably foresee a shooting in response to a stop or arrest, even if illegal. However, under Plaintiffs' evidence in this case, a jury could find that it was reasonably foreseeable that Defendants' dress and illegal stop of persons at this business would make Defendants appear to the Shop's occupants as armed robbers about to harm them. Under Plaintiffs' version of the events, a jury could further find that it was reasonably foreseeable that an illegal stop in this manner at a business might result in the discharge of firearms by the Shop's occupants, the officers' firing back, and injuries to the Shop's occupants being illegally stopped. Thus, we find that Plaintiffs' evidence is sufficient to create jury issues regarding whether, except for Defendants' illegal stop, the damages from Jackson's death and Wimbish's injuries would not have occurred and regarding whether Jackson's death and Wimbish's injuries were reasonably foreseeable consequences of Defendants' illegal stop.[17] Therefore, the district court properly denied Defendants summary judgment on their qualified immunity defenses to Plaintiffs' illegal stop claims for these damages.

---

[17]Additionally, under this causation analysis, Officer Fields's never firing his weapon does not necessarily relieve him of potential liability for these damages because under Plaintiffs' evidence, a jury could find that it was the concerted effort of the three Defendant officers that set off the chain of events that Plaintiffs argue caused Jackson's death and Wimbish's injuries. *See Gutierrez-Rodriguez v. Cartagena,* 882 F.2d 553 (1st Cir.1989) (stating "[i]t was eminently foreseeable that an encounter with a civilian by four [undercover] policemen with weapons drawn and ready to fire might result in a discharge of the firearms and an injury to the civilian"). Of course, if the jury found that Fields was chasing Dean and did not join Sauls in drawing his gun and making the stop, then a different result ensues for Fields.

17

## VII. EXCESSIVE FORCE PRINCIPLES

We next examine Plaintiffs' claims based on excessive force. The Supreme Court has instructed that "*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor,* 490 U.S. 386. 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). It is well established that "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id.* at 396, 109 S.Ct. 1865. To determine whether the force used is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interest against the countervailing governmental interests at stake. *See Id.; Tennessee v. Garner,* 471 U.S. 1, 8, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985); *Crosby v. Paulk,* 187 F.3d 1339, 1351 (11th Cir.1999). Because "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," *Bell v. Wolfish,* 441 U.S. 520, 559, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), "its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Graham,* 490 U.S. at 396, 109 S.Ct. 1865.

Therefore, "[u]se of force must be judged on a case-by-case basis 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.' " *Post v. City of Fort Lauderdale,* 7 F.3d 1552, 1559 (11th Cir.1993) (quoting *Graham,* 490 U.S. at 396, 109 S.Ct. 1865). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham,* 490 U.S. at 396-97, 109 S.Ct. 1865. The reasonableness inquiry is also an objective one. "[T]he question is whether the officers' actions are

'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham,* 490 U.S. at 397, 109 S.Ct. 1865. "An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Id.* at 397, 109 S.Ct. 1865; *see Scott v. United States,* 436 U.S. 128, 138, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978). Furthermore, this Court has concluded that "Fourth Amendment jurisprudence has staked no bright line for identifying force as excessive," that "[t]he hazy border between permissible and forbidden force is marked by a multifactored, case-by-case balancing test," and "[t]he test requires weighing of all the circumstances." *Smith v. Mattox,* 127 F.3d 1416, 1419 (11th Cir.1997).[18]

Utilizing these principles, we now examine Plaintiffs' two separate legal theories for their excessive force claims. Plaintiffs first contend that any force was excessive because the stop was illegal. Alternatively, Plaintiffs assert that even if the stop was legal, Defendants still used excessive force during that stop. We discuss each theory in turn.

## VIII. EXCESSIVE FORCE DURING AN ILLEGAL STOP

As their first theory, Plaintiffs assert that because there was no basis for the stop and no governmental interest at stake, *any* use of force, however minimal, was more than reasonably necessary and excessive. Under this Circuit's law, however, a claim that any force in an illegal stop or arrest is excessive

---

[18]This Circuit evaluates whether an officer's use of force is objectively reasonable by considering myriad factors, such as "(1) the need for the application of force, (2) the relationship between the need and the amount of force used, (3) the extent of the injury inflicted and, (4) whether the force was applied in good faith or maliciously and sadistically." *Moore v. Gwinnett County,* 967 F.2d 1495, 1498 (11th Cir.1992) (quoting *Leslie v. Ingram,* 786 F.2d 1533, 1536 (11th Cir.1986)). Furthermore, "[i]n making this objective assessment, a court may consider in addition to physical injury 'other relevant factors including the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time.' " *Crosby v. Paulk,* 187 F.3d 1339, 1351 (11th Cir.1999) (quoting *Sharrar v. Felsing,* 128 F.3d 810, 822 (3d Cir.1997)). A court may also factor in "the severity of the crime, whether the suspect posed an immediate threat, and whether the suspect was resisting or fleeing." *Gold v. City of Miami,* 121 F.3d 1442, 1446 (11th Cir.1997) (quoting *Post,* 7 F.3d at 1559).

is subsumed in the illegal stop or arrest claim and is not a discrete excessive force claim. *See Williamson v. Mills,* 65 F.3d 155, 158-59 (11th Cir.1995) (holding that a claim that any force during a false arrest is excessive is subsumed in the false arrest claim itself because damages for false arrest include damages for use of force to effect that false arrest).[19] However, as outlined below, a claim for excessive force during a legal stop or arrest is a discrete claim.

*Williamson* 's rule makes sense because if a stop or arrest is illegal, then there is no basis for any threat or any use of force, and an excessive force claim would always arise but only collaterally from the illegal stop or arrest claim. The correct analysis is that the excessive force claim is subsumed in the illegal stop or arrest claim, as recognized in *Williamson,* where a plaintiff contends the force was excessive because there was no basis for *any* force.[20]

---

[19]In *Williamson,* the defendant officer arrested the plaintiff without probable cause and the plaintiff claimed that "there was no need for *any* force as the force was used to accomplish an unlawful arrest." *Id.* at 158. This Court held that the "damages recoverable on [plaintiff's] false arrest claim include damages suffered because of the use of force in effecting the arrest," that "[u]nder these circumstances, [plaintiff's] excessive force claim is subsumed in his false arrest claim," and thus there was "no reversible error in the district court's grant of summary judgment on the excessive force claim as a discrete claim." *Id.* at 158-59. This Court further pointed out that the plaintiff did not argue that the force used was more than that reasonably necessary to effect a valid arrest. *Id.* at 158. *Accord Motes v. Myers,* 810 F.2d 1055, 1059 (11th Cir.1987) (stating that "[i]t is obvious that if the jury finds the arrest unconstitutional, the use of force and the search were unconstitutional and they become elements of damages for the § 1983 violation").

[20]In *Smith v. Mattox,* 127 F.3d 1416, 1418-19 (11th Cir.1997), the plaintiff contended that a search and an arrest were unconstitutional and thus any use of force was excessive. This Court held that plaintiff's "contention failed at the outset because [the plaintiff] has not alleged, or even hinted, in his amended complaint that ... [either] the entry into [the plaintiff's] mother's yard or the arrest itself [was] unconstitutional." *Mattox,* 127 F.3d at 1418. Since there was no illegal search or arrest, the Court did not address the precise issue here but did cite *Williamson* in a footnote. However, in *Thornton v. City of Macon,* 132 F.3d 1395 (11th Cir.1998), this Court did find that the arrest lacked probable cause and stated that "[u]nder the circumstances, the officers were not justified in using any force, and a reasonable officer thus would have recognized that the force used was excessive." *Thornton,* 132 F.3d at 1400. It is unclear whether the excessive force claim survived in *Thornton* because the actual force used was in fact excessive for the particular arrest or because any force was deemed excessive. *Thornton* does not discuss the precise issue here, and, in any event, we must follow the earlier decision in *Williamson. See United States v. Hogan,* 986 F.2d 1364, 1369 (11th Cir.1993) ("[I]t is the firmly established rule of this Circuit that each succeeding panel is bound by the holding of the first panel to address an issue of law, unless and until that holding is overruled en banc, or by the Supreme Court.").

IX. EXCESSIVE FORCE DURING A LEGAL STOP

As their second theory, Plaintiffs assert that even if the investigatory stop was legal, Defendants used more force than reasonably necessary to effect that stop. We examine first Defendants' threat of force in drawing weapons and ordering Plaintiffs to lie on the ground and then Defendants' deadly force.

*A.      Threat of Force*

The right to make an investigatory stop carries with it the right to use some degree of physical coercion or threat thereof to effect it. *See Graham,* 490 U.S. at 396, 109 S.Ct. 1865. Determining whether the degree of force used was reasonable requires consideration of the exigencies of the immediate situation and the officers' being forced to make split-second decisions. Additionally, this Court has held that an officer's drawing a weapon and ordering a person stopped to lie on the ground does not necessarily constitute excessive force during an investigatory stop. *See Courson v. McMillian,* 939 F.2d 1479 (11th Cir.1991) (holding that a deputy did not use excessive force during an investigatory stop in requiring the female companion plaintiff, who was never arrested, and the two males, who were later arrested, to lie face down

on the ground with a shotgun pointed at them).[21] Thus, if the stop was legal, then Plaintiffs have failed to show any excessive threat of force during that stop.

Additionally, the facts the jury would have to find to support arguable reasonable suspicion and to make the stop legal likewise support the threat of force initially used by Defendants during that stop. For example, Defendants base their reasonable suspicion on their contention that Plaintiffs took evasive action in abruptly turning into a parking lot and abandoning their car and that Corey Dean ran when Sauls identified himself as a police officer. If this occurred before Sauls drew his weapon and ordered Plaintiffs to lie on the ground, then the officers' threat of force was not excessive.

At a minimum, we find that Plaintiffs have not shown that a reasonable police officer, making this legal stop, would have known that drawing his gun and ordering Plaintiffs to lie on the ground violated Plaintiffs' clearly established rights. Therefore, the district court erred in denying Defendants' summary

---

[21]In *Courson,* the three detainees had not exited the vehicle when first instructed to and had difficulty getting out of the car; one male was verbally abusive and challenged the deputy's authority to conduct the stop. *Courson,* 939 F.2d at 1496. While waiting for backup and while the two males were arrested, handcuffed and taken away, the deputy with a shotgun still required the plaintiff female to lie on the ground for about thirty minutes even though ultimately she was told she was free to go. Reversing the district court's denial of qualified immunity, this Court held that the deputy was "acting under the exigencies of the immediate situation," and "used no unreasonable force" with respect to the plaintiff or her male companions. *Id.*

The threat of force used here and in *Courson* stands in contrast to the actual force with physical contact in other cases. *See Sheth v. Webster,* 145 F.3d 1231 (11th Cir.1998) (holding that defendant officer was not entitled to qualified immunity where officer arrested plaintiff without any arguable probable cause and used excessive force in pushing her against a soda machine, handcuffing her, and dragging her to a police car); *Smith v. Mattox,* 127 F.3d 1416, 1418-19 (11th Cir.1997) (holding that if jury found that detainee had initially resisted arrest but then "docilely submitted to arrest" and laid down, the defendant officer's then breaking his arm *after* he lay on the ground fell "within the slender category of cases in which the unlawfulness of the conduct is readily apparent even without clarifying caselaw"); *Ortega v. Schramm,* 922 F.2d 684 (11th Cir.1991) (holding jury issue existed regarding excessive force where defendant officer shot padlock off a door without identifying himself as a police officer and then searched the premises, while another officer guarded plaintiff at gun point and then pushed down or kicked plaintiff in the back, and where after the search turned up no evidence, plaintiff was dragged out of the premises and put on the ground).

judgment motion on Plaintiffs' claims that the officers' threat of force during this stop, even if legal, was excessive.

B.      *Deadly Force*

Plaintiffs further claim that Defendants' use of deadly force during this stop, even if legal, was excessive. It is undisputed that Officers Sauls and Pinckney did not shoot until after citizen Stearns shot. Thus, the issue becomes whether Defendants' shooting in response to Stearns's shots was reasonable under the circumstances.

We begin with Officer Sauls's use of deadly force. Under Plaintiffs' version of the events, Officer Sauls was standing in the doorway of the Moto Cycle Shop and was struck in the abdomen by Stearns's two bullets. Stearns then crouched down inside the Shop, but Sauls fired back in an effort to save his own life. The fact that Sauls hit Plaintiff Wimbish, lying on the floor in the Shop, and not Stearns, the man with the gun firing at Officer Sauls, does not negate the reasonableness of Officer Sauls's response to this clearly life-threatening situation.[22] Because it is undisputed that Stearns fired first and that Wimbish was in the same general area where the gunfire originated, we conclude that Sauls's actions were objectively reasonable in light of having been shot and that Sauls is entitled to qualified immunity on Wimbish and Williams's claims of excessive deadly force. We recognize that Jackson subsequently crawled outside of the shop and was struck by two bullets, but it is undisputed that Jackson was hit only by Pinckney's bullets. Therefore, Sauls is also entitled to qualified immunity on Jackson's claim of excessive deadly force.

Officer Pinckney is also entitled to qualified immunity on Wimbish and Williams's claims of excessive deadly force because it is undisputed that he did not fire at or shoot them. However, under Plaintiffs' version of Pinckney's actions, a closer issue is presented regarding whether Pinckney is entitled to

---

[22]Because Stearns shot first, the officers clearly had probable cause to believe they were facing a significant threat of death or physical injury to themselves or others. *See Tennessee v. Garner,* 471 U.S. 1, 11, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985); *see also Hamm v. Powell,* 874 F.2d 766, 771 (11th Cir.1989); *Lundgren v. McDaniel,* 814 F.2d 600, 603 (11th Cir.1987).

23

qualified immunity on Jackson's claim of excessive deadly force. According to Plaintiffs' evidence, Officer Sauls began his retreat up Marietta Street and Officer Pinckney took a position on the south side of the doorway where he could not see Stearns inside of the Shop. In an attempt to escape the gunfire between Stearns and Sauls, Plaintiff Jackson crawled out of the Shop. When Jackson saw Officer Pinckney with a gun drawn, he fell to the ground with his face down on the sidewalk. From his position by the lightpole, Officer Pinckney fired two shots toward the unarmed Jackson who was lying prostrate only thirteen feet away from Officer Pinckney. These two shots did not directly hit Jackson but hit the ground inches in front of Jackson's head and ricocheted up piercing Jackson in the arm and neck. It is undisputed that Pinckney's two bullets fatally wounded Jackson.

Officer Pinckney explains his shots toward Jackson by claiming that he saw the "muzzle of a gun" in the doorway and that he was laying cover fire for his wounded partner Sauls. However, Plaintiffs' evidence contradicts Pinckney's contention about this gun. Plaintiffs offer evidence not only that Jackson never had a gun, but also that no gun, except for Stearns's gun, was located at the scene anywhere. There is also no evidence that Jackson had any other object that could have looked like a gun to Pinckney or that there was any other object in the doorway. Plaintiffs' evidence further shows that Stearns, the only civilian with a gun, was never closer than three feet from the door, making it impossible for the muzzle of his gun to have been in the doorway. Because we must view the evidence in the light most favorable to the Plaintiffs, the "muzzle of a gun" theory does not aid Pinckney in this summary-judgment posture.

However, Pinckney's use of deadly force as cover fire does help him. It is undisputed that Pinckney knew that someone at the Shop had fired three shots at Sauls and that Sauls was retreating and firing back. The record also shows that Pinckney undisputedly had to make split-second decisions in a tense, uncertain, and rapidly evolving situation. Thus, we find that Pinckney's actions in shooting back were reasonable given Stearns's having shot first, the deadly force thus threatening Sauls and Pinckney at this scene, and Sauls's retreating while firing back. At a minimum, we cannot find that under the unusual circumstances of this case,

24

a reasonable police officer would have known that he was violating clearly established law by his use of deadly force after Stearns fired three shots at that police officer's partner. Therefore, Officer Pinckney is also entitled to qualified immunity on Plaintiffs' claims of excessive deadly force during a legal stop.

Unlike Officers Sauls and Pinckney, Officer Fields never fired his weapon or employed deadly force. Plaintiffs claim, however, that Officer Fields should have prevented Pinckney's use of deadly force. *See Byrd v. Clark,* 783 F.2d 1002, 1007 (11th Cir.1986). Since Pinckney is entitled to qualified immunity on his use of deadly force, there is no derivative claim against Fields. Moreover, in order for an officer to be liable for failing to stop another officer's unconstitutional use of deadly force, the officer must be in a position to intervene. *See Ensley v. Soper,* 142 F.3d 1402, 1407 (11th Cir.1998) (addressing officer's liability in the context of failing to stop police brutality). We find that there is no evidence that Fields had time to prevent Pinckney's response. Even in the light most favorable to Plaintiffs, this was a rapidly developing situation in which shots were fired and an officer was retreating while firing his weapon. Therefore, we find that Fields's conduct was objectively reasonable and that he is entitled to qualified immunity on Plaintiffs' claims of excessive deadly force.

Finally, since Defendants are entitled to summary judgment on Plaintiffs' excessive force claims, the district court also erred in granting Plaintiffs' motion for summary judgment on Defendants' qualified immunity defenses to Plaintiffs' excessive force claims.

## X. CONCLUSION

In summary, we find (a) that the district court properly denied Defendants' motions for summary judgment on their qualified immunity defenses to the Plaintiffs' illegal stop claims, (b) that the district court erred in denying Defendants' motions for summary judgment on their qualified immunity defenses to Plaintiffs' excessive force claims, (c) that the district court erred in granting Plaintiffs' motion for summary judgment on Defendants' qualified immunity defenses to Plaintiffs' illegal stop and excessive force claims,

25

and (d) that the district court erred in failing to rule on Defendants' motion for summary judgment on their qualified immunity defenses to Plaintiffs' equal protection claims.

We remand these cases to the district court with instructions that prior to trial or further discovery, the district court shall rule on Defendants' motion for summary judgment based on their qualified immunity defenses to Plaintiffs' equal protection claims. Additionally, when the facts are determined from the conflicting evidence at trial, the district court may also be required to revisit whether Defendants are entitled to qualified immunity on Plaintiffs' illegal stop claims.[23]

AFFIRMED in part, REVERSED in part, and REMANDED.

---

[23] *See Cottrell v. Caldwell,* 85 F.3d 1480, 1487-88 (11th Cir.1996) (stating that "when a district court has denied the qualified immunity defense prior to trial based upon its determination that the defense turns upon a genuine issue of material fact, the court should revisit that factual issue when, and if, the defendant files a timely Fed.R.Civ.P. 50(a) or (b) motion"). *Id.* at 1488. Our *Cottrell* decision also discusses how the district court may use special interrogatories to resolve the genuine issues of fact that are determinative of the qualified immunity issue. *Id.* at 1487-88.